#23998-r-RWS

**2007 SD 97**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

*In Re* the Matter of
J.D.M.C.
* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIFTH JUDICIAL CIRCUIT
ROBERTS COUNTY, SOUTH DAKOTA

* * * *

HONORABLE SCOTT P. MYREN
Judge

* * * *

WILLIAM J. JANKLOW
Sioux Falls, South Dakota
and
GORDON P. NIELSEN of
Delaney, Vander Linden,
  Delaney, Nielsen & Sannes, PC
Sisseton, South Dakota               Attorneys for appellant Father.

ANDREW M. SMALL
JESSICA L. RYAN of
Blue Dog, Paulson & Small
Minneapolis, Minnesota
and
KAREN GANGLE
Tribal Prosecutor
Agency Village, South Dakota        Attorneys for appellee Sisseton-
                                      Wahpeton Oyate.

DANELLE J. DAUGHERTY of
Bantz, Gosch & Cremer, LLC
Aberdeen, South Dakota          Attorneys for intervenor
                               appellee Mother.

* * * *

ARGUED OCTOBER 2, 2006

OPINION FILED **09/12/07**

#23998

SABERS, Justice

[¶1.] We determine whether the circuit court correctly granted full faith and credit or comity to a tribal court abuse and neglect order when all parties, at all relevant times, lived off the reservation. Because the Sisseton-Wahpeton Oyate Tribe (SWO) and Mother did not meet their burden to show the tribal court had personal jurisdiction, we reverse the circuit court.

## FACTS

[¶2.] Mother and Father were married in Sisseton, South Dakota, on December 27, 2002. Mother is an enrolled member of the SWO Tribe and Father is a non-Indian. The couple had two daughters, J.D.M.C. and T.J.C., both enrolled members of the SWO. In 2005, Mother and Father were divorced in state court in Sisseton, South Dakota, Roberts County. The parties shared joint legal and physical custody of both children, but the children resided with Father in Sisseton while Mother lived in Biloxi, Mississippi, where she was stationed as a member of the military. The parties agreed the girls would reside with Father during the school year and reside with Mother during the summer while she was stationed in Biloxi.

[¶3.] Despite this agreement, Mother and Father decided Father would have the girls for the summer of 2005. It was during this time that T.J.C. died when Father accidentally left her in the car while he went to work in Browns Valley, Minnesota. Father was investigated but no criminal charges were filed. Mother filed an abuse and neglect petition in tribal court, alleging J.D.M.C. was abused and neglected, based on the incident with T.J.C., and sought protective custody pending

-1-

a child protection investigation. The tribal court entered an ex-parte emergency custody order making J.D.M.C a ward of the tribal court. The state court would not grant comity[1] to the emergency custody order.

[¶4.] SWO's Child Protection Program (CPP) filed an emergency custody petition and Mother filed an abuse and neglect petition[2] in tribal court to remove J.D.M.C. from Father's custody. Father appeared specially to contest jurisdiction. While the tribal court found J.D.M.C. did not reside on the reservation, it found she was a ward of the tribal court. Therefore, the tribal court found it had jurisdiction and issued an order for emergency custody (order).[3]

[¶5.] SWO then filed a motion to enforce the order in circuit court. Father filed a motion for a comity hearing and to invalidate the order. Mother intervened in the action. At the hearing, Father argued the tribal court had no jurisdiction to enter the order since none of the parties had ever resided or been domiciled on the reservation. SWO contended the tribal court had exclusive jurisdiction under the Indian Child Welfare Act (ICWA), since J.D.M.C. was declared a ward of the tribal

---

1. Comity is defined as "[a] practice among political entities (as nations, states, or courts of different jurisdictions), involving . . . mutual recognition of legislative, executive, and judicial acts." Black's Law Dictionary, *available at* http://www.westlaw.com.

2. At the hearing, Mother indicated she had filed for a change of custody in the circuit court of Roberts County as well.

3. The tribal court ordered J.D.M.C. to be placed into the temporary legal care, custody and control of SWO's Child Protection Program, to be placed with an appropriate family member. The order instructed the parents to appear at a later date to answer to the abuse and neglect proceeding and declared J.D.M.C. a ward of the tribal court.

court. After the hearing, the circuit court adopted the tribal court's memorandum opinion and found the order was entitled to full faith and credit under ICWA. The circuit court also found SDCL 1-1-25, the comity statute, was preempted by ICWA. Despite firmly believing ICWA preempted SDCL 1-1-25, the circuit court went on to find the order met the requirements of SDCL 1-1-25.

[¶6.] Father appeals, raising the following issues:

1. Whether the circuit court erred in determining the tribal court had jurisdiction.

2. Whether the circuit court erred in determining the order was not subject to comity under SDCL 1-1-25 because ICWA preempted SDCL 1-1-25.

3. If ICWA does not preempt SDCL 1-1-25, whether the circuit court erred in determining SWO had met its burden of proving the comity factors set forth in SDCL 1-1-25 had been met by clear and convincing evidence.

4. Whether the circuit court erred in determining that SWO was not required to provide notice to the South Dakota Attorney General pursuant to SDCL 15-6-24(c), regarding its challenge to SDCL 1-1-25.

## STANDARD OF REVIEW

[¶7.] This case involves a jurisdictional question. An issue regarding jurisdiction is a question of law reviewed de novo. *Grajczyk v. Tasca*, 2006 SD 55, ¶8, 717 NW2d 624, 627 (additional citations omitted). "[W]e afford no deference to the conclusions reached by the trial court." *In re* Adoption of H.L.C., 2005 SD 110, ¶18, 706 NW2d 90, 92 (quoting *In re* Yankton County Comm'n., 2003 SD 109, ¶9, 670 NW2d 34, 37).

[¶8.] Questions of statutory interpretation are reviewed de novo. People *ex rel.* J.S.B., Jr., 2005 SD 3, ¶12, 691 NW2d 611, 615 (citing City of Rapid City v. Pennington County, 2003 SD 106, ¶5, 669 NW2d 120, 121).

[¶9.] **1. Whether the circuit court erred in concluding the SWO had jurisdiction.**

[¶10.] The major contention of SWO is that ICWA provides the tribe with exclusive jurisdiction because J.D.M.C. was a ward of the tribal court. SWO further argues in the alternative that (a) J.D.M.C. was domiciled on the reservation; and (b) a purchase service agreement between SWO and the state conferred jurisdiction to the tribe in this type of case.

[¶11.] In the early seventies, Congress became concerned about the detrimental effect the removal of Indian children from their homes was having on the Indian tribes, children and families. Mississippi Band of Choctaw Indians v. Holyfield, 490 US 30, 32, 109 SCt 1597, 1599-1600, 104 LEd2d 29 (1989). In response, Congress enacted the Indian Child Welfare Act of 1978. *Id.; see also* 25 USCA §§ 1901-1963. This act was designed to limit the "wholesale removal of Indian children from their homes," ensure Indian tribes would not be negatively harmed by the removal, and allow Indian children to remain connected to the tribe through preferential Indian family and foster home placements. *Holyfield*, 490 US at 32, 109 SCt at 1600, 104 LEd2d 29. The most important aspect of ICWA, especially for the purpose of this case, is its jurisdictional provisions. *Id.* at 36, 109 SCt at 1601, 104 LEd2d 29.

[¶12.] The starting point of ICWA is an Indian child, as there must be an Indian child who meets the statutory definition before ICWA is applicable. *See*

People *ex rel.* D.T., 2003 SD 88, ¶16, 667 NW2d 694, 699.  An Indian child is "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe."  25 USCA § 1903(4).  After this threshold is met, ICWA's jurisdictional mandates can be separated into two different types of cases.  In the first type of case, the Indian tribe would have exclusive jurisdiction.  The exclusive jurisdiction cases involve "an Indian child who resides or is domiciled within the reservation of such tribe" or an Indian child who "is a ward of a tribal court . . . notwithstanding the residence or domicile of the child."  25 USCA 1911(a).[4]

[¶13.]     In cases originating in State court, if the Indian child is not a domiciliary or resident of the reservation, or ward of the tribal court, then section 1911(b) of ICWA has been interpreted to create concurrent jurisdiction between the Indian tribe and the State court.  *Holyfield*, 490 US at 36, 109 SCt at 1601-02, 104 LEd2d 29 ("Section 1911(b) . . . creates concurrent[,] but presumptively tribal jurisdiction[,] in the case of children not domiciled on the reservation[.]"); *In re*

---

4.     Section 1911(a) provides:

> Exclusive jurisdiction
>
> An Indian tribe shall have jurisdiction exclusive as to any State over any child custody proceeding involving an Indian child who resides or is domiciled within the reservation of such tribe, except where such jurisdiction is otherwise vested in the State by existing Federal law. Where an Indian child is a ward of a tribal court, the Indian tribe shall retain exclusive jurisdiction, notwithstanding the residence or domicile of the child.

C.W., 479 NW2d 105, 112 (Neb 1992); s*ee also* 25 USCA § 1911(b).[5]  A parent may object to the transfer of the case to tribal court, or the tribe may decline jurisdiction.[6]  25 USCA § 1911(b).

[¶14.]    In this case, J.D.M.C. is an Indian child since she is an enrolled member of SWO.  25 USCA § 1903(4).  It is clear from the record that J.D.M.C. did not reside on the reservation.  She was living in Sisseton at the time.  ICWA defines "reservation" as:

> Indian country as defined in section 1151 of Title 18 and any lands, not covered under such section, title to which is either held by the United States in trust for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to a restriction by the United States against alienation.

Section 1903(10).  "Indian country" is described in 18 USCA § 1151 as:

> (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian

---

5.    Section 1911(b) provides:

> In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent, upon the petition of either parent or the Indian custodian or the Indian child's tribe:  *Provided*, that such transfer be subject to declination by the tribal court of such tribe.

6.    A tribe also has the right to intervene in a State court proceeding at any time.  25 USCA § 1911(c).

> allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

Sisseton does not meet the definition of "reservation" under ICWA. The SWO reservation was determined to be diminished. *See* DeCoteau v. Dist. Court, 420 US 425, 427-28, 95 SCt 1082, 1084-85, 43 LEd2d 300 (1975). Sisseton does not rest on the "checkerboard" of Indian land that resulted from the diminishment. *Id.* at 464, 95 SCt at 1102, 43 LEd2d 300 (Douglas, J., dissenting). Nor is that portion of Sisseton on which they resided trust land or allotted land or a dependent Indian community. Therefore, they did not reside in Indian country.

[¶15.] However, SWO claims it has exclusive jurisdiction because (a) J.D.M.C. is domiciled on the reservation, since it is Mother's domicile, and (b) J.D.M.C. was declared a ward of the tribal court. SWO also claims it has jurisdiction due to (c) a purchase service agreement with DSS. We examine each claim.

(a) Domicile

[¶16.] SWO claims, and the tribal court found, that Mother was domiciled on the reservation. Domicile is established for adults by physical presence in a place combined with intent to remain there. *Holyfield*, 490 US at 48, 109 SCt at 1608, 104 LEd2d 29 (citing Texas v. Florida, 306 US 398, 424, 59 SCt 563, 576, 83 LEd 817 (1939)). A minor takes the domicile of his parents. *Id.*

[¶17.]    At the comity hearing conducted in the circuit court, Father testified that Mother had lived in either Sisseton or Biloxi, Mississippi[7] the entire time of their marriage. They were divorced in Sisseton on February 3, 2005. From the time of the divorce to the time of the abuse and neglect petition in tribal court, it is unclear where Mother was residing or domiciled. However, a person's domicile remains the same until a person acquires a new one. *Id.* There was no record evidence that Mother established her presence on the reservation with intent to remain, which is required in order for her to be domiciled on the reservation.[8]

[¶18.]    The circuit court adopted the tribal court's memorandum opinion, part of which concluded Mother's domicile was the reservation. However, the record does not include any factual findings from either the tribal court or the circuit court in support of this conclusion. The circuit court's "[f]indings of [f]act must be supported by the evidence and [c]onclusions of [l]aw must in turn be supported by the [f]indings of [f]act." Adrian v. McKinnie, 2004 SD 84, ¶9, 684 NW2d 91, 95. Since the record is completely devoid of evidence or facts supporting the circuit court's conclusion, we cannot accept the conclusion that Mother's domicile is the reservation.

---

7.    Living with her husband in Sisseton meets the requisite elements for a domicile as it exhibits both a presence and intent to remain. Mother was stationed in Biloxi, Mississippi for her service in the Air Force. This would not change her domicile to Biloxi as she would not have intent to remain there.

8.    At oral argument, Mother conceded she had not lived on the reservation since 1997.

[¶19.]     Even assuming that Mother's domicile is the SWO reservation, it does not necessarily follow that J.D.M.C.'s domicile is the reservation. In *Holyfield*, the United States Supreme Court found that an illegitimate child takes the domicile of his mother.[9] 490 US at 48, 109 SCt at 1608, 104 LEd2d 29. In *Interest of G.R.F.*, we followed the reasoning in the *Holyfield* case and found an illegitimate child took the domicile of its mother. 1997 SD 112, ¶16, 569 NW2d 29, 33. In *Estate of Galada*, we noted, that the "domicile of a minor child is that of the parent to whose custody it has been legally awarded." 1999 SD 21, ¶11, 589 NW2d 221, 223 (quoting Application of Habeck, 75 SD 535, 541, 69 NW2d 353, 356 (1955)).

[¶20.]     In this case, J.D.M.C. is not an illegitimate child, as the parents were married and the Father acknowledges her as his own and took her into his family. *See* SDCL 25-6-1.[10] After the divorce, the parties shared joint legal and physical custody. However, Father had physical custody of J.D.M.C. for a greater amount of time than Mother as the children lived with Father during the school year, and Mother was to have them during the summer. Despite this agreement, the children

---

9.     In *Holyfield*, the reservation was the Mother's and the Father's domicile. 490 US at 48, 109 SCt at 1608, 104 LEd2d 29.

10.     SDCL 25-6-1 provides:

> The father of an illegitimate child by publicly acknowledging it as his own, receiving it as such into his family, with the consent of his wife if he is married and otherwise treating it as if it were a legitimate child, thereby adopts it as such, and such child is thereupon deemed for all purposes legitimate from the time of its birth. The other provisions of law relating to adoption shall not apply in such cases.

were actually living with Father during the summer of 2005. The domicile of J.D.M.C. is Father's domicile of Sisseton as she was living with him in Sisseton at the time the abuse and neglect petition was filed.[11] Given this record, there is no reason Mother's alleged domicile would control over Father's domicile.

(b) Ward of the tribal court

[¶21.] The tribal court declared it had exclusive jurisdiction because J.D.M.C. was a ward of the SWO tribal court. Section 1911(a) provides that "the Indian tribe shall *retain* exclusive jurisdiction" where the "Indian child is a ward of a tribal court" regardless of the Indian child's domicile or residence. 25 USCA § 1911(a) (emphasis added). Father argues the plain meaning of "retain" requires that the Indian tribal court has already declared the Indian child to be a ward of the court prior to commencement of the action. He claims the tribe cannot "retain" jurisdiction if none existed prior to commencement of the action.

[¶22.] The Indiana Supreme Court examined a similar issue. In *Matter of Adoption of T.R.M.*, the Indiana Supreme Court considered whether a tribe could obtain exclusive jurisdiction by declaring the Indian child a ward of the tribal court

---

11. Several other jurisdictions have held that the child's domicile is the same as the parent with whom he is living. *See* Matter of Adoption of T.R.M., 525 NE2d 298, 306 (Ind 1988) (citing *In re* Marriage of Rinderknecht, 367 NE2d 1128, 1132 n3 (IndCtApp 1977)); Ross v. Pick, 86 A2d 463, 467 (Md 1952); Beckmann v. Beckmann, 218 SW2d 566, 569 (Mo 1949) (en banc); *In re* Thorne, 148 NE 630, 631 (NY 1925); Palagi v. Palagi, 627 NW2d 765, 772 (NebCtApp 2001); Somerville Bd. of Educ. v. Manville Bd. of Educ., 752 A2d 793, 796 (NJSuperCtAppDiv 2000); Geesbreght v. Geesbreght, 379 NE2d 738, 744 (IllAppCt 1978) (examining Texas law); s*ee also* Restatement (First) of Conflict of Laws § 32 (1934) (when parents have joint custody, child takes the domicile of the parent with whom he lives).

over five months after filing their habeas petition and one day before the adoption petition was filed in state court. 525 NE2d 298, 301-02, 306 (Ind 1988). The court declared that "[section] 1911(a) can pertain only to such wardship orders of the tribal court which are entered *while the child is residing or domiciled on the reservation*" reasoning, "[t]his allows the tribal court to exercise subsequent exclusive jurisdiction . . . when the domicile or residence of the child has changed after the initial tribal court order of wardship." *Id.* at 306 (emphasis added). The court concluded that:

> The tribal court could not be empowered to effectuate the status of a child as a "ward of the court" relying upon [section] 1911(a) where the child was never domiciled on the reservation, and was not residing on the reservation at the time the tribal court exercised jurisdiction and entered the wardship order.

*Id.*

[¶23.]     SWO contends that J.D.M.C. can be declared a ward of the tribal court after commencement of the proceedings. Even the SWO's Tribal Code supports Father's argument,

> [t]he Sisseton-Wahpeton Sioux Tribe shall retain original and exclusive jurisdiction over children as wards of the Tribe notwithstanding residence or domicile, sufficient to determine all matters and disposition of the child, *which it would have if the child had remained on the Reservation. . . .*

Tribal Code 38-05-02 (emphasis added). Similarly, the Bureau of Indian Affairs has promulgated guidelines on how some provisions of ICWA should be interpreted. One guideline regarding the determination of jurisdiction states: "If the Indian child has *previously resided or been domiciled on the reservation*, the state court shall contact the tribal court to determine whether the child is a ward of the tribal

-11-

court." Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed.Reg. 67,584, B.4(b) (1979) (not codified)[12] (emphasis added). The regulation does not suggest an Indian child can be made a ward of the tribal court even if it has never been domiciled on the reservation. On the contrary, the regulation suggests the opposite conclusion – a child can only be a ward of the tribal court if it has "previously resided or been domiciled on the reservation." *Id.*; *see also* 25 USC § 1911(a) ("Where an Indian child *is* a ward of the tribal court, the Indian tribe shall *retain* exclusive jurisdiction, notwithstanding the residence or domicile of the child.") (emphasis added).

[¶24.] Additionally, we have held, tribal jurisdiction for purposes of "ICWA is established as of the date the action is filed." *In re* S.G.V.E., 2001 SD 105, ¶18, 634 NW2d 88, 92 (citing *In re* G.R.F., 1997 SD 112, ¶19, 569 NW2d at 34) (additional citations omitted). "It is a well-established rule in both federal and state courts that jurisdiction over a case is established at the time an action is filed and cannot be voided [or altered] by later events." *In re G.R.F.*, 1997 SD 112, ¶19, 569 NW2d at 34 (quoting Spear v. McDermott, 916 P2d 228, 234 (NMCtApp 1996)) (additional citations omitted).

[¶25.] In this case, Father's arguments are correct. The plain language of section 1911(a) and the case law demonstrate the only effective way a wardship order can be used to obtain exclusive jurisdiction is to enter the order while the

---

12. *Available at* http://www.nicwa.org/policy/regulations/icwa/ICWA_guidelines.pdf.

Indian child is domiciled or residing on the reservation[13] and before the proceeding commenced. Therefore, SWO could not obtain exclusive jurisdiction by declaring J.D.M.C. a ward of the tribal court after the proceedings began.

(c) Jurisdiction Based on Purchase Service Agreement

[¶26.] In its memorandum opinion, the tribal court found it had jurisdiction due to the purchase service agreement. Despite this finding, at the comity hearing SWO stated that the purchase service agreement had "absolutely nothing to do with what we're here for today." It went on to state, "[w]ith regard to the agreement between the State of South Dakota and the Tribe, that's never an assertion of – is never an argument for assertion of jurisdiction that's been made by the Tribe." Despite SWO's argument at the comity hearing, in its brief to this Court, SWO claims the purchase service agreement between DSS and SWO grants SWO jurisdiction. Father argues subject matter jurisdiction cannot be conferred by an agreement.

[¶27.] It is evident this argument was not raised (indeed, it was renounced) during the comity hearing. Generally, this Court will not address arguments not raised below. However, this rule is procedural and we have discretion to ignore the rule when faced with a compelling case. We will address the issue as the tribal court found jurisdiction through the agreement and the circuit court adopted the tribal court's memorandum opinion, both sides have fully briefed the issue, it was argued during oral argument, and it presents an important question in the public

---

13.   This does not include situations where jurisdiction is established under 25 USC § l9l9(a)(state/tribal agreements) or 25 USC § l911(b) (transfers).

interest. *See* Nature's 10 Jewelers v. Gunderson, 2002 SD 80, ¶19, 648 NW2d 804, 808-09 (Konenkamp, J., dissenting) (citing Hormel v. Helvering, 312 US 552, 557-58, 61 SCt 719, 721-22, 85 LEd 1037, 1041 (1941); Sharp v. Sharp, 422 NW2d 443, 445-46 (SD 1988)).

[¶28.]     ICWA specifically provides for such agreements. Section 1919 authorizes:

> States and Indian tribes . . . to enter into agreements with each other respecting care and custody of Indian children and *jurisdiction* over child custody proceedings, including agreements which may provide for orderly transfer of jurisdiction on a case-by-case basis and agreements which provide for *concurrent jurisdiction* between States and Indian tribes.

25 USCA § 1919 (emphasis added). SWO and DSS have entered into a purchase service agreement that SWO alleges is of the type contemplated by section 1919. The current agreement is the same type of agreement that has been in effect for over twenty years. This current agreement authorizes the tribe to provide "all child protective services" previously provided by DSS, "within the territory of Sisseton-Wahpeton Oyate to all eligible clients. . . ."

[¶29.]     The determination of jurisdiction due to this agreement hinges in part on the meaning of the word "territory" in the purchase service agreement. SWO contends the word "territory" refers to the original boundaries of the SWO reservation, including Roberts, Day and Marshall Counties. Father argues the word "territory" cannot mean the original reservation as the territory of SWO does not include Sisseton. *See DeCoteau*, 420 US at 464, 95 SCt at 1102, 43 LEd2d 300 (Douglas, J., dissenting).

[¶30.]     Contract interpretation is a question of law to be reviewed de novo. Pauley v. Simonson, 2006 SD 73, ¶8, 720 NW2d 665, 667 (citing Ziegler Furniture & Funeral Homes, Inc. v. Cicmanec, 2006 SD 6, ¶14, 709 NW2d 350, 354). Where the contract is not ambiguous, we look to the plain meaning of the words to establish the parties' intentions. *Id.* Parol evidence is only allowed when the terms of the contract are ambiguous. *Id.* Ambiguity is a question of law for a court to determine. Canyon Lake Park, L.L.C. v. Loftus Dental, P.C., 2005 SD 82, ¶18, 700 NW2d 729, 734 (citing Baker v. Wilburn, 456 NW2d 304, 306 (SD 1990)).

[¶31.]     "Territory" is defined as "[a] geographical area included within a particular government's jurisdiction; the portion of the earth's surface that is in a state's exclusive possession and control." Black's Law Dictionary 702 (8th ed 2004). SWO's argument fails under the plain and ordinary meaning of "territory." "Territory" is not capable of two different meanings, and is not ambiguous. The SWO "territory" is the area "within [the tribe's] jurisdiction" and "the portion of the earth . . . that is in [the tribe's] exclusive possession and control." Since 1975, it has been understood that the Lake Traverse Reservation was terminated, resulting in a jurisdictional schematic resembling a checkerboard, and "giving state court jurisdiction over conduct of non-Indian lands within the 1867 reservation borders." *See DeCoteau*, 420 US at 428, 95 SCt at 1085, 43 LEd2d 300. Sisseton does not fall within the territory of the SWO, nor can SWO exercise jurisdiction over Sisseton. *See id.* at 464, 95 SCt at 1102, 43 LEd2d 300 (Douglas, J., dissenting).

[¶32.]     SWO argues that "territory" means the original boundaries of the Lake Traverse Reservation; otherwise, SWO entered into a contract for the jurisdiction

they already controlled. SWO further claims the agreement was entered into specifically to clear up the confusion the *DeCoteau* case created with the checkerboard jurisdiction. However, this contract neither enlarges SWO's territory nor does it confer the claimed jurisdiction. On the contrary, the contract is labeled "Agreement for Purchase of Service." This contract "permits the state to purchase certain specified services. . . ." This agreement allows SWO to provide the child protection services DSS previously provided on the reservation to all eligible clients.[14]

[¶33.] By using the word "territory" in the purchase service agreement, SWO contracted to perform child protection services over the area "within [the tribe's] jurisdiction." This area does not include Sisseton, so the agreement cannot be said to confer any jurisdiction under section 1919 of ICWA.[15]

---

14. In 2004, the Governor's Commission on the Indian Child Welfare Act conducted hearings and drafted a report relating to implementation of ICWA and areas of concern and improvement for South Dakota. This report specifically mentioned the state should work together with other tribes to implement agreements like the contract with DSS and SWO. One of the top 30 recommendations was to implement these agreements so tribes could provide "full child welfare services to its children domiciled on its reservation . . ." but did not mention giving tribes more jurisdiction than they previously possessed. Nor did the commission report indicate SWO had more jurisdiction than any other tribe. Rather, the commission report said DSS provides child protection services on other reservations, but does not on SWO reservation because of this contract. Furthermore, the commission report indicates one purpose of these agreements is to provide administrative and IV-E funding to the tribes. *See* Indian Child Welfare Act Commission Report located at http://www.state.sd.us/oia/files/report.pdf, pp. 6, 51, 56, 84-85.

15. Additionally, 25 USCA § 1919(b) requires "such agreement may be revoked by either party upon one hundred and eighty days' written notice to the other party." The purchase service agreement between DSS and SWO requires only thirty days notice.

[¶34.]    Parties who are aware of certain jurisdictional problems and who want to confer jurisdiction, should specifically use language that confers jurisdiction. For example, the contract could have specified that the services will be provided within the original boundaries of the Lake Traverse Reservation. Moreover, when subject matter jurisdiction can only be conferred by the constitution or statute, *Application of Koch Exploration Co.*, 387 NW2d 530, 536 (SD 1986) (additional citations omitted), the agreement needs to be specific that jurisdiction is being conferred pursuant to a federal statute. In any event, using "territory" did not confer any more jurisdiction than SWO already possessed. The purchase service agreement cannot be used on appeal to confer jurisdiction. Given the language used in the contract, this was not within the contemplation of the parties.

[¶35.]    The contract does not confer jurisdiction on SWO, and the requirements for exclusive jurisdiction under ICWA are not met. Father argued in his brief that section 1911(b) prevented tribal jurisdiction because, as provided for in section 1911(b), he objected to the tribe exercising authority over him. However, Father's counsel argued at oral argument that ICWA simply does not apply because there is no exclusive jurisdiction nor is this a "state proceeding" under section 1911(b). Under the plain language of section 1911(b), it only applies "[i]n any *State* court proceeding" and does not apply when the proceeding was initiated in tribal court. (Emphasis supplied).

[¶36.]    Moreover, SWO agreed that section 1911(b) was not relevant to the jurisdictional issue. From a review of the original petition filed by SWO in the circuit court, it is apparent that neither SWO, nor subsequently, Mother and

Father,[16] see this as a section 1911(b) case. In SWO's brief it stated that "[section 1911(b)] does not apply to the case at bar, as the matter did not originate in State Court. . . . Clearly, the transfer of jurisdiction provision only applies to transferring cases *to* Tribal Court." Additionally, the circuit court, in its bench decision and subsequent findings of facts and conclusions of law, never addressed concurrent jurisdiction. Thus, any issue regarding section 1911(b) is not before this Court.

[¶37.]        ***Full Faith and Credit and Comity Analysis***

[¶38.]        While Indian tribes are not technically "states" to which the United States Constitution's full faith and credit clause would apply, under ICWA, a judgment entered in the SWO tribal court must be given full faith and credit in our state courts. *See* 25 USC § 1911(d).[17] Full faith and credit applies so long as the tribal court "had jurisdiction over the parties and the subject matter." *See* Nevada v. Hall, 440 US 410, 421, 99 SCt 1182, 1188, 59 LEd2d 416. "[A] judgment is entitled to full faith and credit-even as to questions of jurisdiction-when the second court's inquiry discloses that those questions have been fully and fairly litigated and finally decided in the court which rendered the original judgment." Durfee v. Duke,

---

16.    As referenced above, counsel for Father argued during oral argument that section 1911(b) is irrelevant.

17.    25 USC § 1911(d) requires:

The United States, every State, every territory or possession of the United States, and every Indian tribe shall give full faith and credit to the public acts, records, and judicial proceedings of any Indian tribe applicable to Indian child custody proceedings to the same extent that such entities give full faith and credit to the public acts, records, and judicial proceedings of any other entity.

375 US 106, 111, 84 SCt 242, 245, 11 LEd2d 186 (1963). *See also* Baldwin v. Iowa State Traveling Men's Ass'n., 283 US 522, 525-27, 51 SCt 517, 518, 75 LEd 1244 (1931); Wells v. Wells, 2005 SD 67, ¶¶17-21, 698 NW2d 504, 509 (in the context of a party contesting personal and subject matter jurisdiction of a State court in subsequent State court proceeding, this Court noted "[a]n even stronger preclusion applies to collateral challenges to personal jurisdiction").[18]

[¶39.] The issues of personal and subject matter jurisdiction *appear* to have been litigated in tribal court. The tribal court's memorandum opinion indicates, and Father concedes in his brief, that he appeared specially to contest jurisdiction. We have noted:

> Where a defendant appears in an action to object that the court has no jurisdiction over him and the court overrules the objection and judgment is rendered against him, the parties are precluded from collaterally attacking the judgment on the ground that the court had no jurisdiction over the defendant.

*Wells*, 2005 SD 67, ¶19 n1, 698 NW2d at 509 n1 (quoting Restatement (First) of Judgments § 9 (1942)). Accordingly, assuming a complete record on this point, Father could not collaterally attack the tribal court judgment in state court and we could not examine whether or not there was personal jurisdiction under *Durfee v. Duke*, 375 US at 111, 84 SCt at 245, 11 LEd2d at 191, and *Baldwin v. Iowa State Traveling Men's Ass'n*, 283 US at 525-27, 51 SCt at 518, 75 LEd 1244. Here, Father

---

18. Under a full faith and credit review, the judgment may also be examined for fraud. Kwongyuen Hangkee Co., Ltd. v. Starr Fireworks, Inc., 2001 SD 113, ¶8, 634 NW2d 95, 96-97 (quoting Hilton v. Guyot, 159 US 113, 202-03, 16 SCt 139, 158, 40 LEd 95, 122 (1895)).

was attempting to directly prevent the enforcement of the tribal court order in circuit court by showing the tribal court did not have personal jurisdiction.

[¶40. ] Although the tribal court indicated Father appeared specially to contest personal and subject matter jurisdiction, the record only includes the tribal court's memorandum opinion but no transcript of the proceedings. This prevents us from reviewing whether these questions were "fully and fairly litigated" or whether the order is a final judgment.[19] Therefore, we examine whether SWO could assert personal jurisdiction over Father.

[¶41.] The tribal court, circuit court and the parties referenced *Montana* when discussing personal jurisdiction. Montana v. United States, 450 US 544, 565-66, 101 SCt 1245, 1258, 67 LEd2d 493 (1981). Both the tribal court and circuit court agreed that SWO had personal jurisdiction over Father because he entered

---

19. Father appealed the tribal court decision to the SWO appellate court, but at this time we do not know the outcome of that appeal. We have been advised as of August 21, 2007 that oral argument is set for September 7, 2007 at 11:15 a.m. in Bismarck, North Dakota before the Northern Plains Intertribal Court of Appeals. It is unclear from research whether an appealed decision in tribal court is a final judgment.

> "It is for the local law of the state of rendition to determine whether a judgment is final even though it is subject to appeal or has been appealed. If an appeal is taken which, by the local law of the state of rendition, vacates the judgment, no action can be maintained on the judgment in another state."

Restatement (Second) of Conflict of Laws § 107 (1971). Therefore, we may examine whether jurisdiction exists because it is unclear that this issue has been "finally decided." *See Durfee*, 375 US at 111, 84 SCt at 245, 11 LEd2d 186 (noting "[A] judgment is entitled to full faith and credit-even as to questions of jurisdiction-when the second court's inquiry discloses that those

(continued . . .)

#23998

into a consensual relationship with the tribe by marrying Mother and allowing his children to receive services from the tribe. *See Montana*, 450 US at 565-66, 101 SCt at 1258, 67 LEd2d 493.[20] However, marrying a tribal member, allowing children to be enrolled members of the tribe and receiving tribal services do not qualify under the consensual relationship exception in *Montana*. Atkinson Trading Co., Inc. v. Shirley, 532 US 645, 655, 121 SCt 1825, 1833, 149 LEd2d 889 (2001); *In re*

---

(. . . continued)

> questions have been fully and fairly litigated and *finally decided* in the court which rendered the original judgment.") (Emphasis added).

20. While discussing that most inherent tribal authority regarding the relations between an Indian tribe and nonmembers of the tribe has been divested, the Court noted the general rule is that the sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe. However,

> Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands. A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter *consensual relationships* with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.

> *Montana*, 450 US at 565-66, 101 SCt at 1258, 67 LEd2d 493 (emphasis added) (additional and internal citations omitted). The analysis encompassed in *Montana* and its progeny "represents the status of a tribe's inherent sovereign powers after divestiture of all powers deemed inconsistent with the tribe's dependent status. [*Montana*, 450 US at 563-64, 101 SCt at 1257, 67 LEd2d 493.] Such divestiture has been characterized as restricting tribes' powers "to determine their external relations" (i.e., assert their powers over nonmembers)." [*Id.* at 564, 101 SCt at 1257, 67 LEd2d 493]. David M. Blurton, *John v. Baker and the Jurisdiction of Tribal Sovereigns Without Territorial Reach*, 20 Alaska LRev 1, 15-16 (2003).

-21-

Application of Defender, 435 NW2d 717, 718-21 (SD 1989).  In addition, *Montana* is really a test for subject matter jurisdiction, typically used to determine if tribal courts have legislative jurisdiction.[21, 22]  *See* Strate v. A-1 Contractors, 520 US 438,

_____

21.  Even if *Montana's* consensual relationship exception was applied in the personal jurisdiction context, there is still no personal jurisdiction.  Marrying a tribal member and allowing your children to receive tribal services does not constitute the consensual relationship contemplated by the *Montana* jurisdictional analysis.  *See* Strate v. A-1 Contractors, 520 US 438, 457, 117 SCt 1404, 1415, 137 LEd2d 661 (1997) (discussing "the types of activities the Court had in mind" when considering *Montana's* consensual relationship exception); *see also* Blurton, *John v. Baker and the Jurisdiction of Tribal Sovereigns Without Territorial Reach*, 20 Alaska LRev at 13-14 (2003) (citing Nevada v. Hicks, 533 US 353, 371-72, 121 SCt 2304, 2316, 150 LEd2d 398 (2001) (noting the Supreme Court has restricted the first exception to private consensual commercial transactions occurring within Indian country between a nonmember and either the tribe or its members).

Furthermore, simply because a consensual relationship may exist is not enough for jurisdiction.  Discussing *Montana*, the Eighth Circuit explained:

> The existence of a consensual relationship is not alone sufficient to support tribal jurisdiction.  *See Strate*, 520 US at 457, 117 SCt 1404. The tribal exercise of authority *must also take the form of taxation, licensing, or "other means" of regulating the activities of the nonmember*, Montana, 450 US at 565, 101 SCt 1245, and *this regulation must have some nexus to the consensual relationship*. Atkinson Trading Co. v. Shirley, 532 US 645, 656, 121 SCt 1825, 149 LEd2d 889 (2001).  In other words, a nonmember's consensual relationship in one area "does not trigger tribal civil authority in another." *Id.*

Plains Commerce Bank v. Long Family Land & Cattle Co., 491 F3d 878, 886-87 (8thCir 2007).

22.  *Montana* began as a test for determining the tribe's regulatory authority over non-Indians' conduct on non-Indian fee lands within the reservation.  In *Strate v. A-1 Contractors*, 520 US 438, 456-60, 117 SCt 1404, 1416, 137 LEd2d 661 (1997), the Supreme Court extended the *Montana* test to determine whether the tribe had adjudicatory jurisdiction for conduct by a non-Indian on non-Indian fee land within

(continued . . .)

445, 117 SCt 1404, 1409, 137 LEd2d 661 (1997) ("The Court of Appeals concluded that our decision in *Montana v. United States* . . . was the controlling precedent, and that, under *Montana*, the Tribal Court lacked *subject-matter jurisdiction* over the dispute. We granted certiorari . . . and now affirm."); *see also* Frank R. Pommersheim, The Crucible of Sovereignty: Analyzing Issues of Tribal Jurisdiction, 31 Ariz LRev 329, 334-35, 344 (noting "[t]ribal legislative and judicial jurisdiction are not the same thing" and a tribal court cannot reach the question of legislative jurisdiction if there is a lack of judicial jurisdiction).

[¶42.] Moreover, analysis under *Montana* may not even be relevant in this case for a second reason. The *Montana* analysis generally applies to conduct *within the reservation. See Montana*, 450 US at 565, 101 SCt at 1258, 67 LEd2d 493 (noting "Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on [or within] their reservations . . ."). Courts generally do not apply the *Montana* analysis to a situation where conduct of a non-Indian, nonmember occurs off the reservation, and instead, hold to the rule that absent a clear federal directive, tribal authority does not extend to conduct off the reservation. *See* Blurton, *John v. Baker and the Jurisdiction of Tribal Sovereigns*

_____

(. . . continued)

the reservation. *See* Cohen's Handbook on Federal Indian Law § 7.02[1][a], 599-601 (2005 ed). In *Nevada v. Hicks*, the United States Supreme Court extended the *Montana* analysis to situations where the land was owned by a tribal member. 533 US 353, 364, 121 SCt 2304, 2313, 150 LEd2d 398 (2001). The land was still within the reservation. *Id.* at 356, 121 SCt at 2309.

*Without Territorial Reach,* 20 Alaska LRev at 18-19 (noting "tribal jurisdiction is non-existent over nonmember conduct outside of Indian country"); Mescalero Apache Tribe v. Jones, 411 US 145, 148-49, 93 SCt 1267, 1270-71, 36 LEd2d 114 (1973) (noting that "absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State"). There is no dispute that the conduct at issue in this case occurred entirely off the reservation. Therefore, the *Montana* analysis may not apply. *See* Hornell Brewing Co. v. The Rosebud Sioux Tribal Court, 133 F3d 1087, 1091 (8thCir 1998) ("Neither *Montana* nor its progeny purports to allow Indian tribes to exercise civil jurisdiction over the activities or conduct of non-Indians occurring outside their reservations."); *see also* Pommersheim, The Crucible of Sovereignty, 31 Ariz LRev at 336, 343 (discussing that the analysis of judicial jurisdiction determines "whether the tribal court has proper subject matter, personal, and *territorial jurisdiction* over the controversy" and, citing *DeCoteau,* 420 US at 427 n2, 95 SCt at 1085 n2, and observing that the definition of "Indian country" applies to civil jurisdiction).

[¶43.]     ***Personal jurisdiction and minimum contacts analysis***

[¶44.]     Generally, tribal law indicates the tribal court can exercise personal jurisdiction if the person has sufficient minimum contacts with the reservation in order to meet the due process requirements of the Indian Civil Rights Act (ICRA). *See* 25 USC § 1302; Red Fox v. Hettich, 494 NW2d 638, 645 (SD 1993); *In re* Defender, 435 NW2d 717 (SD 1989); *see also* B.J. Jones, *A Primer on Tribal Court Civil Practice, available at* http://www.court.state.nd.us/court/resource/tribal.htm.

ICRA imposes a statutory due process clause on the tribal court. *See* 25 USC § 1302(8); Cohen's Handbook of Federal Indian Law, Chs. 7.02[2] & 14.04[2]. Accordingly, whether tribal courts have personal jurisdiction over a party is analyzed using the minimum contacts standard expressed in *International Shoe v. Washington*, 326 US 310, 316, 66 SCt 154, 158, 90 LEd 95 (1945)); Teague v. Bad River Band of Lake Superior Tribe of Chippewa Indians, 665 NW2d 899, 910 (Wis 2003) (citing Hinshaw v. Mahler, 42 F3d 1178 (9thCir 1994)); *see also* Cohen's Handbook of Federal Indian Law, at 7.02[2]. We inquire whether Father "had sufficient minimum contacts with [SWO reservation] to conclude that the assertion of jurisdiction does not offend 'traditional notions of fair play and substantial justice.'" Daktronics, Inc. v. LBW Tech Co., Inc., 2007 SD 80, ¶5, 737 NW2d 413, 416-17 (quoting *Int'l Shoe Co.*, 326 US at 316, 66 SCt at 158, 90 LEd 95). "[A]n essential criterion in all cases is whether the 'quality and nature' of the defendant's activity is such that it is 'reasonable' and 'fair' to require him to conduct his defense in that State." Kulko v. Superior Court of California, 436 US 84, 92, 98 SCt 1690, 1697, 56 LEd2d 152 (1978).

[¶45.]     Recently, we reiterated the three-part test our Court uses to determine if minimum contacts exist and due process has been satisfied:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state, thus invoking the benefits and protections of its laws. Second, the cause of action must arise from defendant's activities directed at the forum state. Finally, the acts of defendant must have substantial connection with the forum state to make the exercise of jurisdiction over defendant a reasonable one.

*Daktronics, Inc.*, 2007 SD 80, ¶6, 737 NW2d at 417 (quoting Frankenfeld v. Crompton Corp., 2005 SD 55, ¶17, 697 NW2d 378, 384 (citing Rothluebbers v. Obee, 2003 SD 95, ¶26, 668 NW2d 313, 322; Denver Truck & Trailer Sales, Inc., 2002 SD 127, ¶11, 653 NW2d 88, 91; Opp v. Nieuwsma, 458 NW2d 352, 355-56 (SD 1990))). We have noted that "[m]ore in the way of 'minimum contacts' is required for a tribal court to exercise long-arm jurisdiction over a non-Indian 'than would be sufficient for the citizen of one state to assert personal jurisdiction over the citizen of another state.'" *Red Fox*, 494 NW2d at 645 (quoting Babbitt Ford, Inc. v Navajo Indian Tribe, 519 FSupp 418, 431 (Ariz 1981) *aff'd in part, rev'd in part on other grounds*, 710 F2d 587 (9thCir 1983), *cert. denied*, 466 US 926, 104 SCt 1707, 80 LEd2d 180 (1984)).

[¶46.]      Here, Father is a nonresident, non-tribal member who never resided or domiciled on the reservation.  For all times relevant to this proceeding, neither his children nor his ex-wife resided or domiciled on the reservation.  Father has not purposefully availed himself to the benefits and protections of the laws of the SWO reservation.  Father's connections with SWO are too attenuated to constitute minimum contacts.  The "quality and nature" of Father's actions are not such that it would be reasonable and fair for him to require him to conduct his defense in this forum.  *See* Kulko, 436 US 84, 92, 98 SCt 1690, 1697, 56 LEd2d 152 (finding no "purposeful act" and, therefore, no personal jurisdiction over defendant where he had consented to his child living in the forum).  Father has not had sufficient contacts with the reservation, so personal jurisdiction would not be met. *See In re Defender*, 435 NW2d at 720, 721.

[¶47.]	The tribal court also relied on the status exception to due process to explain personal jurisdiction over Father was unnecessary.  The status exception allows for cases involving personal status of an individual to be adjudicated in his or her home forum even though a party to the action is outside the forum's jurisdiction and cannot be served within the forum.  Shaffer v. Heitner, 433 US 186, 201, 97 SCt 2569, 2578, 53 LEd2d 683, 696 (1977) (additional citation omitted).  Child custody is a typical area where the status exception is applied; however, the status exception is inapplicable in this case.  A fundamental part of the status exception is the child's presence in the forum.  *See id.* (noting that "the personal status of the plaintiff . . . [can] be adjudicated in the *plaintiff's home* State even though the *defendant [can]not be served within that State*") (emphasis added).  J.D.M.C. was not present on the reservation and due process cannot be circumvented by utilizing the status exception.

[¶48.]	Additionally, comity review examines the judgment for, among other things, the existence of personal and subject matter jurisdiction.  SDCL 1-1-25.[23]

_____

23.	SDCL 1-1-25 provides:

No order or judgment of a tribal court in the State of South Dakota may be recognized as a matter of comity in the state courts of South Dakota, except under the following terms and conditions:

(1) Before a state court may consider recognizing a tribal court order or judgment the party seeking recognition shall establish by clear and convincing evidence that:
(a) The tribal court had jurisdiction over both the subject matter and the parties;
(b) The order or judgment was not fraudulently obtained;

(continued . . .)

As indicated above, the tribe lacked personal jurisdiction over Father. Therefore, neither full faith and credit nor comity should have been granted to the tribal court order.

[¶49.] Moreover, a review of the circuit court's findings and conclusions demonstrates it applied the wrong standard of review in the hearing. Under SDCL 1-1-25, the party arguing that comity should be granted has the burden to demonstrate that comity should be granted. Neither SWO nor Mother called a single witness despite repeated invitations from the circuit court to do so. They also did not present the circuit court with a transcript of the tribal court proceedings.[24] *Compare In re G.R.F.,* 1997 SD 112, ¶¶22-29, 569 NW2d at 34-35 (holding that affidavit evidence submitted to the circuit court was sufficient to support a finding below that the tribal court maintained jurisdiction over an abuse and neglect

_____

(. . . continued)

    (c) The order or judgment was obtained by a process that assures the requisites of an impartial administration of justice including but not limited to due notice and a hearing;
    (d) The order or judgment complies with the laws, ordinances and regulations of the jurisdiction from which it was obtained; and
    (e) The order or judgment does not contravene the public policy of the State of South Dakota.

    (2) If a court is satisfied that all of the foregoing conditions exist, the court may recognize the tribal court order or judgment in any of the following circumstances:
    (a) In any child custody or domestic relations case; or
    (b) In any case in which the jurisdiction issuing the order or judgment also grants comity to orders and judgments of the South Dakota courts; or
    (c) In other cases if exceptional circumstances warrant it; or
    (d) Any order required or authorized to be recognized pursuant to 25 USC, § 1911(d) or 25 USC, § 1919.

24.    *See supra* ¶¶39-40.

proceeding). Both announced to the circuit court that they rested solely on a legal argument based on the tribal court's memorandum opinion and order. It is clear that this was not an inadvertent oversight by counsel but an intentional trial strategy. Given the fact that there is no evidence to establish SWO could exert personal jurisdiction, the order should not receive full faith and credit or comity. The circuit court erred in granting full faith and credit under section 1911(d) and comity under the dictates of SDCL 1-1-25.

[¶50.]     This case arises from the most regrettable circumstances. However, we are not determining an abuse and neglect proceeding, but determining which court may decide the issue. The question in this case is whether a tribal court may assert jurisdiction based on off-reservation conduct over an Indian child and a non-Indian parent domiciled and residing off the reservation. As we have stated before, "absent the applicability of the ICWA, we do not believe that [sovereignty] principles may be extended so as to grant tribal courts the exclusive authority to adjudicate disputes which involve Indian children when neither the child nor the parents reside on the reservation." *In re Defender*, 435 NW2d at 722.

[¶51.]     The exclusive jurisdiction provisions of ICWA do not apply to this action as J.D.M.C. was not domiciled or residing on the reservation or a ward of the tribal court when the action commenced. Furthermore, given the lack of personal jurisdiction and the lack of evidence to support the tribal court's decision, it was

error for the circuit court to grant full faith and credit or comity to the tribal court order. We reverse the circuit court.[25]

[¶52.] GILBERTSON, Chief Justice, and ZINTER and MEIERHENRY, Justices, concur.

[¶53.] KONENKAMP, Justice, dissents.

KONENKAMP, Justice (dissenting).

[¶54.] I would give full faith and credit to the Sisseton-Wahpeton Oyate Tribal Court order. It was obtained after an abuse and neglect petition was personally served on the father, and the subject of the order, a Native American child, is an enrolled member of the tribe, and the father appeared through counsel in tribal court to litigate jurisdiction. Under long-standing principles, we are bound to recognize the tribal court's determination of its own jurisdiction. Judicial proceedings in tribal courts are entitled to the same full faith and credit as any other out-of-state judicial proceeding. Under 25 U.S.C. § 1911(d), Congress provided:

> **Full faith and credit to public acts, records, and judicial proceedings of Indian tribes**
>
> The United States, every State, every territory or possession of the United States, and every Indian tribe shall give full faith and credit to the public acts, records, and judicial proceedings of any Indian tribe applicable to Indian child custody proceedings to the same extent that such entities give full faith and credit to the public acts, records, and judicial proceedings of any other entity.

---

25.    Due to our decision on these issues, we do not reach the remaining issues.

[¶55.] It is true that in ordinary circumstances a judgment of a court in one jurisdiction is conclusive on the merits in another jurisdiction *only if* the court in the first jurisdiction had power to pass on the merits. Here, however, the issue of jurisdiction was litigated in tribal court; thus, *res judicata* applies, and the question of jurisdiction should not be relitigated.[26] "[A] judgment is entitled to full faith and credit—even as to questions of jurisdiction—when the second court's inquiry discloses that those questions have been fully and fairly litigated and finally decided in the court which rendered the original judgment." Durfee v. Duke, 375 US 106, 111, 84 SCt 242, 245, 11 LEd2d 186 (1963).

[¶56.] This Court takes the position that because there is no transcript of the tribal court proceedings we are prevented from determining whether the jurisdictional questions were fully and fairly litigated. However, the father does not contend in this appeal that he did not have a full and fair opportunity to litigate the jurisdictional questions in tribal court. On the contrary, he appeared by counsel, and, after a hearing, the tribal judge entered a thoughtful written decision fairly considering whether the tribal court had subject matter and personal jurisdiction.

---

26. While a court may not have subject matter jurisdiction, still "it may have jurisdiction to determine the question whether it has jurisdiction over the subject matter and to bind the parties by its determination, with the result that thereafter they are precluded from successfully contending that the court had no jurisdiction over the subject matter." Restatement (First) of Judgments § 10 cmt a (1942).

Neither does the father contend that he was denied basic due process rights, including the right to a fair hearing before an impartial tribal judge.[27]

[¶57.]       The father's argument before us is only that the tribal court entered an erroneous decision.  But, as the United States Supreme Court has noted, "[e]rroneous or not," when the jurisdictional issue was fully and fairly litigated and finally determined, another jurisdiction's judgment cannot be collaterally attacked. Underwriters Nat'l Assurance Co. v. N.C. Life and Accident and Health Insurance Guaranty Ass'n, 455 US 691, 704-05, 102 SCt 1357, 1371, 71 LEd2d 558 (1982). Moreover, the father never argued that the tribal court did not enter a final judgment, as this Court seems to suggest.  At this point, the case is apparently being treated as a final judgment because the father is presently appealing that judgment before the Northern Plains Intertribal Court of Appeals.  *See* Bell v. Dillard Dep't Stores, Inc., 85 F3d 1451, 1456 (10thCir 1996) (lack of opportunity to appeal may weigh against finding that a party had a full and fair opportunity to litigate an issue).

[¶58.]       For these reasons, I respectfully dissent.

---

27.    The judge who decided the jurisdictional questions, Chief Tribal Judge B.J. Jones, is a licensed attorney in several states and is a member of the faculty of the University of North Dakota School of Law.