2000 SD 112

**In the Matter of the ESTATE OF John LeLand NEISWENDER, Deceased.**

**No. 21288.**

Supreme Court of South Dakota.

Argued June 1, 2000.

Decided Aug. 16, 2000.

A.P. Fuller of Fuller, Tellinghuisen, Gordon and Percy, Lead, Attorneys for appellant Elaine Neiswender.

Steven C. Beardsley and Linden R. Evans of Truhe, Beardsley, Jensen, Helmers, and Von Wald, Rapid City, Attorneys for appellee Claire Neiswender.

KONENKAMP, Justice

[¶ 1.] In this probate action, the circuit court refused to exclude real property in New Mexico from the estate of John L. Neiswender. The deceased had bequeathed the property to his wife, but his daughter contended that a family agreement restricted the transfer to blood relatives. The court ruled that evidence of an agreement was inconclusive, and that even if an agreement existed, it was void as an unreasonable restraint on the free alienation of property. We affirm, concluding that a valid family agreement was not established.

### Background

[¶ 2.] John Neiswender died on July 17, 1998. His will gave his interest in land located in New Mexico to his wife, Claire Neiswender.[1] John's daughter, Elaine Neiswender (Claire's stepdaughter), contests Claire's right to inherit this real estate. The property consists of 160 acres leased for oil and gas exploration and production. William and Lucinda Neiswender, John's grandparents, originally owned the land. Later, it was held as an asset by the Neiswender Corporation and as a trust asset by the Neiswender Family Trust. Neither the corporate bylaws nor the trust instrument restricted the transfer of interests in the property to blood relatives of William and Lucinda.

[¶ 3.] The trust was dissolved in 1971 and the property was distributed to the trust beneficiaries as co-tenants, i.e., Leland Neiswender (John's father), Chester Neiswender (John's uncle), and Mildred Shryer (John's aunt). Shortly after the trust ended, these co-tenants purportedly agreed that the property could not be transferred to anyone other than descendants of William and Lucinda Neiswender. No contemporaneous documents or memoranda exist to confirm that agreement. In the years following, nonetheless, on two occasions the co-owners' descendants conveyed their shares in the property to someone other than a blood relative.

[¶ 4.] In 1981, family member Philip Neiswender bequeathed his interest to his wife. One of the other co-tenants at the time, Merilyn Howard, attempted to have that share returned to the family, but admitted in a letter to her uncle Chester that

---

1. John's will stated in part:

   To my wife, Claire Neiswender, I bequeath my interests in property and gas, oil and mineral rights to properties owned by the former Neiswender Corporation and the Neiswender Trust as follows:
   1. A 25 percent (25%) interest in real property in Eddy County, New Mexico as follows:

   \* \* \* \*

   2. Ownership and interest, whether royalty, mineral or otherwise, in the gas produced from the Yates Petroleum Corporation – Federal "AB" Well, . . . .

her task was "especially difficult since neither the corporation bylaws nor the trust agreement stipulated sole Neiswender ownership without right of inheritance by other than blood relatives." Although she kept her interest in the property, Philip's widow nevertheless agreed not to transfer it to anyone other than a descendant of William and Lucinda. Similarly, in 1988, Chester's daughter, Rosemary Neiswender, gave her share to a friend, Virginia Buchanan. When Merilyn learned of this gift, she asked Ms. Buchanan to renounce her right to the property so that it would remain in the family. Ms. Buchanan acceded.

[¶ 5.] When several co-tenants died intestate and without issue, the operator of the wells on the property, Yates Petroleum Corporation, suspended royalty payments to avoid liability to unknown heirs. In his letters of July 6, 1989 and September 1, 1990, John Neiswender tried to assure Yates Petroleum that Chester and his daughter, Rosemary, both deceased, had no heirs and thus their royalties should be paid to the remaining co-tenants. But Yates was reluctant to release the funds until ownership was legally settled. John referred to a letter Chester had signed on January 4, 1982 and to declarations seven family members signed stating their understanding that the property could not be transferred to "anyone other than direct descendants of William and Lucinda Neiswender." Although the letter John referred to is not in the record, at least one of the declarations still exists. It was signed by Carl Neiswender dated January 2, 1982, and recites the same understanding.

[¶ 6.] Merilyn Howard wrote to Yates Petroleum on February 1, 1989. Her letter is the strongest evidence of an agreement because copies of it were signed by all the living co-tenants: Merilyn, John Neiswender, Carl Neiswender, and Richard Shryer. The letter explained to Yates Petroleum that a family meeting had been held shortly after March 15, 1971, at which time it was "reconfirmed that interests in the residual property shares of the former family corporation and trust would be inheritable only by blood relatives." Apparently, Yates Petroleum still refused to release the royalties, and a quiet title action was instituted. In 1992, a New Mexico court order quieting title granted fee simple ownership to John, Carl, Richard, and Merilyn.

[¶ 7.] As the contestant to John Neiswender's will, which left his interest in the New Mexico land to his wife Claire, Elaine Neiswender sought to remove the property from his estate. In her view, the family had a "long-standing agreement" that the property would not be given or transferred to anyone other than a blood relative. The parties waived appearance and oral argument in circuit court, and the matter was decided on briefs. The court found "inconclusive evidence" of an agreement to limit the transfer of the property to only blood relatives, and ruled that even if such an agreement existed, it would be void as an unreasonable restraint on the free alienation of property under New Mexico law.[2] Accordingly, the request to remove the property from the estate was denied.

[¶ 8.] In this appeal, Elaine contends that the circuit court erred in not holding that John Neiswender contracted away his right to devise the New Mexico property.[3] As the court made its findings

---

2. As we hold that a valid family agreement was not conclusively established, we need not reach the question whether it constituted an unreasonable restraint on the alienation of property.

3. Neither side questions our jurisdiction in this appeal to decide whether the New Mexico property should be included in the estate. *See* SDCL 29A–1–301. Nor does anyone contend that the purported family agreement was

from documentary evidence to decide the existence of a contract, the question was purely a legal determination. Questions of law are reviewed de novo, as are mixed questions of law and fact. *In re Estate of Jetter*, 1999 SD 33, ¶ 12, 590 N.W.2d 254, 257 (citations omitted); *Estate of Washburn*, 1998 SD 11, ¶ 8, 575 N.W.2d 245, 247 (citations omitted).

## Analysis and Decision

[¶ 9.] Existence of a valid contract is a question of law. *Owens v. Moyes*, 530 N.W.2d 663, 665 (S.D.1995) (citing *Werner v. Norwest Bank*, 499 N.W.2d 138, 141 (S.D.1993)). "[A]n express contract exists only when the parties mutually express an intent to be bound by specific terms and conditions." *Id.* (citing *Werner*, 499 N.W.2d at 141). It is an agreement arrived at by words, either oral or written. *Weller v. Spring Creek Resort, Inc.*, 477 N.W.2d 839, 841 (S.D.1991); *Anderson v. Dunn*, 68 S.D. 479, 482, 4 N.W.2d 810, 811 (1942).

[¶ 10.] A family agreement is a written or oral understanding among parties having an interest in a decedent's estate to distribute or dispose of the property in a manner different from that prescribed by law or by testamentary instrument. *See* M.L. Cross, Annotation, *Family Settlement of Testator's Estate*, 29 A.L.R.3d 8, 18–22 (1970). Although family settlement agreements receive tolerant deference when disputes arise over the distribution of estates, these agreements are nonetheless "subject to the rules of contract formation." *In re Estate of Krause*, 444 N.W.2d 4, 7 (S.D. 1989). *See also* SDCL 53–1–2 (elements of a contract). The proponent has the burden "to prove the contract by evidence so clear and satisfactory" that no doubt remains. *Neuharth v. Brunz*, 85 S.D. 267, 274, 181 N.W.2d 92, 95 (1970) (citing *Ward v. Melby*, 82 S.D. 132, 142 N.W.2d 526 (1966)); *In re Estate of*

*Hammer*, 389 Pa. 78, 132 A.2d 275, 277 (1957) (citation omitted).

[¶ 11.] In *Neuharth*, we held that the trial court rightly decided that the plaintiff failed to establish the existence of an agreement for the disposition of property, ruling that the evidence as a whole tended to show there was no agreement. 85 S.D. 267, 181 N.W.2d at 96. In *Hammer*, conversely, the evidence showing the existence of an agreement was much clearer. The agreement was partly in writing and partly oral; only the oral portion was challenged. The court concluded that the parties had entered into a family settlement agreement, basing its decision on evidence consisting of "[t]he positive, uncontradicted testimony of the participants to the agreement"—the three surviving family members of the seven who had entered into the agreement on the distribution of their parents' property thirty-five years earlier testified against their pecuniary interests, and were unanimous in the substance of their testimony that all family members had understood that they were making a family agreement. *Hammer*, 132 A.2d at 277–78. Additionally, the later conduct of the parties in interest, a failure to take action contrary to the "agreement," and a delay of over thirty-eight years after the death of the parents before seeking an accounting tended to show that a valid family agreement existed. *Id.*

[¶ 12.] Elaine asserts that because her father, John, enforced this agreement against other family members to his benefit, equity requires that it be enforced against him. On the other hand, John's estate argues that the letters written to Yates Petroleum about the ownership of the property were intended for the narrow purpose of distribution of production royalties. The estate asserts that no evidence conclusively establishes that all future transfers would be restricted to only blood relatives. Rather, the language of John's will sets out his stated intent, and that

a court-approved compromise. *See* SDCL 29A–3–1101.

intent was to leave his interest in the New Mexico property to his wife.

[¶ 13.] We think the circumstances are insufficient to show a clear intent to create an irrevocable agreement. *See Neuharth*, 181 N.W.2d at 96; E. Allan Farnsworth, Contracts § 3.7, at 200 (2d Ed. 1990). There is no direct proof of the original understanding in 1971 made by the first co-tenants after the Neiswender trust was dissolved. Some of the later owners seemed to dispose of their interest in the property without heed to this alleged agreement. Others invoked the purported understanding when it appeared advantageous to them. While the letters to Yates Petroleum might be interpreted as showing the existence of a family agreement, they might also be interpreted as merely intending the narrow purpose of inducing Yates Petroleum to release the royalty payments, attempting to avoid the expense and delay of a quiet title action. Further, the record does not show that John himself attempted to enforce the alleged agreement against non-relatives; rather, it reflects that Merilyn urged non-blood recipients to voluntarily return interests received in the property to direct descendents of William and Lucinda.

[¶ 14.] If the co-tenants thought themselves bound to keep the property in the family, they must also have believed they could terminate that obligation at will. On June 9, 1998, just before John's death, Merilyn Howard wrote to John expressing her desire, shared by Carl Neiswender and Richard Shryer, to sell the New Mexico property. In this letter, Merilyn warned, "[i]t will be a long, long time before it will be worth more," and encouraged John to "reconsider [his] decision not to sell." There was apparently an offer for the property of $12,000. Elaine does not claim that the offer was from a blood relative. This attempt to sell wholly contradicts earlier declarations by the same family members that the property could not be "sold, transferred or willed to anyone other than direct descendants of William and Lucinda Neiswender."

[¶ 15.] Elaine believes that *Kuhn v. Kuhn*, 281 N.W.2d 230 (N.D.1979) directly supports her position. In contrast to the case before us, the existence of the family agreement was not in issue in *Kuhn;* the court there was asked to decide only the validity of the agreement. *Id.* at 234. With the concurrence of their children, the husband and wife had made mutual promises to distribute their property, which, although not a valid joint and mutual will because certain formalities had not been followed, was held to be a legally binding contract to divide the couple's real and personal property. Testimony established that the parents had a common plan for the distribution of their estate after their deaths. One of their sons sought to enforce the agreement when property that was to be given to him under the agreement was bequeathed to someone else in his mother's will. The trial court ruled that the agreement was invalid for lack of consideration, but the North Dakota Supreme Court held the mutual promises made by the husband and wife "constituted adequate consideration." *Id.* at 236.

[¶ 16.] Another difference between this case and *Kuhn* lies in the nature of the two agreements. A family agreement settles the distribution of family property among interested parties. Black's Law Dictionary 606 (7th Ed. 1999). Equity supports family agreements because they allow a final and amicable resolution of disputes over estate distributions. *See In re Vasgaard's Estate*, 62 S.D. 421, 253 N.W. 453, 456 (1934) (the law favors family compromise); SDCL 16–6–8; SDCL 29A–1–103. In *Kuhn*, the agreement provided for the devise of property in final distribution to family members. Here, the putative agreement goes far beyond simply distributing or disposing of estate property; it attempts to create an interminable restriction, perpetually barring transfer to anyone other than those in the Neiswender bloodline. Yet transfers

by former co-tenants to non-descendants and attempts to sell the property suggest a contrary understanding. We are unable to say that proof of the alleged contract is "so clear and satisfactory" that no doubt remains on the terms of a binding agreement. *Neuharth*, 181 N.W.2d at 95. Furthermore, no case cited to us supports a restriction of this sort under the auspices of a family agreement. Elaine has failed to prove that this property should be excluded from the estate.

[¶ 17.] Affirmed.

[¶ 18.] MILLER, Chief Justice, and SABERS and GILBERTSON, Justices, and ANDERSON, James W., Circuit Judge, concur.

[¶ 19.] ANDERSON, James W., Circuit Judge, sitting for AMUNDSON, Justice, disqualified.