#24650-a-BARNETT, Circuit Judge
**2008 SD 32**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

LAMORE RESTAURANT GROUP, LLC
and KENNETH HERSLIP,                          Plaintiffs and Appellees,

  v.

ROBERT AKERS and CYNTHIA AKERS,             Defendants and Appellants.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT
OF THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE A. PETER FULLER
Judge

\* \* \* \*

JOHN K. NOONEY of
Nooney Solay & VanNorman, LLP          Attorneys for plaintiffs
Rapid City, South Dakota               and appellees.

COURTNEY R. CLAYBORNE and
MICHAEL K. SABERS of
Clayborne, Loos, Strommen & Sabers, LLP   Attorneys for defendants
Rapid City, South Dakota                  and appellants.

\* \* \* \*

CONSIDERED ON BRIEFS
ON FEBRUARY 11, 2008

OPINION FILED 4/16/08

#24650

BARNETT, Circuit Judge

[¶1.]     Robert and Cynthia Akers (Akers) appeal from a judgment holding that Akers and LaMore Restaurant Group, LLC and Kenneth Herslip (collectively LaMore) had entered into a binding contract for the sale of two Rapid City, South Dakota, commercial properties with the price to be set by a first and third appraiser, notwithstanding the absence of a specified date for the appraisals.  Akers also appeal from that part of the judgment setting the specific date to be used by the first and third appraisers in establishing the price for the two properties.  We affirm.

FACTS AND PROCEDURAL HISTORY

[¶2.]     Akers are the owners of two commercial restaurant properties in Rapid City, South Dakota.  Pursuant to a lease, they rented both properties to LaMore, who operated them as Denny's Restaurants.  The original lease contained an option to purchase at paragraph XXVIII and established an appraisal process for fixing the price if the option was exercised.  Several restrictions on the appraisal process were set forth in paragraph XXVIII.  If the respective appraisers were less than ten percent apart, the average of those two numbers would be the final price.  If the first two appraisals differed in price by more than ten percent, the two appraisers would agree upon a third appraiser, who would then choose either the first or the second appraisal as the fair price.  The third appraiser's choice would be final as to price, subject to a minimum price of $2,500,000.

[¶3.]     On February 23, 2005, LaMore indicated its intent to exercise the option to purchase the properties.  On that date, Akers signed an Addendum to the lease agreement (hereinafter First Addendum), essentially repealing paragraph

XXVIII of the original lease and revamping the agreed appraisal process. The First Addendum removed the minimum purchase price of $2,500,000, leaving the price solely to the appraisal process. The parties were to agree upon a Member of the Appraisal Institute (MAI) certified appraiser within fourteen days of the exercise of the option. That appraiser would set the price; if either party disagreed with the first appraisal, they could then get another appraisal from an MAI certified appraiser of their choice. If the two appraisals were within seven percent of each other, the First Addendum required the two appraisers to "convene and determine the value for the subject property, and to the extent that a compromise is not reached between them, the two appraisals shall be averaged" which would then be the final price. If the two appraisals differed by more than seven percent, "the parties shall agree on a third MAI certified appraiser *who shall work with the initial MAI certified appraiser to determine the appraised value."* (Emphasis added).

[¶4.] Thus, if the first two appraisers differed by more than seven percent, the second appraisal was discarded and a third appraiser, chosen by both parties, would "work with" the first appraiser to determine the value.

[¶5.] The parties agreed to hire Joe Ibach to conduct the first appraisal. Ibach appraised each property at $900,000, for a total of $1,800,000. Upon notification of this appraisal, Akers exercised their right to hire a second MAI appraiser, John Haeder. Haeder's appraisal did not use the same appraisal date as Ibach. Instead, Haeder's appraisal date was some seven months later, on December 1, 2007. This lead to a significant difference in Haeder's appraisal: $1,045,000 for

the Rushmore Road location, and $1,300,000 for the LaCrosse location. Two reasons apparently drove the higher numbers. First, LaMore made substantial improvements to one of the properties subsequent to exercising the purchase option and after the first appraisal was conducted. Second, Akers received a December 1, 2007, outside offer on the properties and gave that information to the second appraiser (Haeder), who used it to help determine the values he set on that same date.

[¶6.] Since the first appraisal (Ibach) and the second appraisal (Haeder) were more than seven percent apart, the First Addendum required the parties to agree on a third appraiser. However, they could not agree on the third appraiser and the matter went to court to settle. The trial court, after reviewing the First Addendum, essentially ordered the parties to do what they had agreed to do; they were sent out of court to agree upon a third appraiser. Thereafter, the parties stipulated that Ken Simpson, a name offered by Akers, would be the third appraiser assigned to work with Ibach, the first appraiser.

[¶7.] In the interim, negotiations continued between Akers and LaMore and eventually in April 2007 a sale was finalized on the Rushmore Road property. This was evidenced in a document entitled Second Addendum. The Second Addendum set the agreed price at $950,000 for that property which was to be a credit against any final price set by the first and third appraisers under the First Addendum. This Second Addendum did not vitiate the First Addendum; it merely removed one property from the dispute and left the overall appraisal price in the hands of the first and third appraisers as contemplated by the First Addendum.

[¶8.]    During the process of working with Ibach, Simpson raised the question of the date he should use in setting a value.  This brought the matter back to the trial court for clarification.  The court took testimony, heard arguments, and eventually ordered that the third appraiser utilize a date of September 1, 2005.  This date was a rough compromise between LaMore's assertion that the third appraiser should use the same date (April 27) used by the first appraiser, and Akers' contention that a later date should be utilized.  Both parties apparently balked at this compromise date and the matter again came back to the trial court.

[¶9.]    Akers argued that the First Addendum was merely an agreement to agree, and that there had been no meeting of the minds on a material term of the contract, *i.e.*, the date the third appraiser should use in fixing the value.  In the alternative, Akers argued that the court should set the date for the third appraisal either as the date Simpson was retained by the parties, which would be much later than the April 27 first appraisal, or some other later date (which would reflect the improvements and the outside offer).  However, Simpson testified that according to appraisal protocols, the normal method of conducting a follow-up appraisal is to use the same date as the first appraiser.

[¶10.]    Following a final hearing, the court entered findings, conclusions and a judgment finding that the First Addendum was enforceable despite the lack of a specific date for the third appraiser to utilize.  In so doing, it held that a contract need not specify an exact price so long as a method for determining the price was agreed to in the contract.  Although the court expressed concerns about whether it could pick a date for the appraiser under South Dakota law and that the use of a

later date could be inequitable in light of the subsequent improvements made by

LaMore, the court set the date for the third appraiser at April 27, 2005, the date

used by the first appraiser.[1]

[¶11.]      Akers raise two issues on appeal:

> Whether the First Addendum constituted a valid contract
> which could be enforced by the parties.

> Whether the trial court had the authority to determine a
> date of valuation when none was supplied.

## STANDARD OF REVIEW

[¶12.]      "We review the circuit court's findings of fact under the clearly

erroneous standard." City of Deadwood v. Summit, Inc., 2000 SD 29, ¶ 9, 607

NW2d 22, 25 (citations omitted). "Conclusions of law are reviewed under a de novo

standard, giving no deference to the circuit court's conclusions of law." Id. (citations

omitted). "Existence of a contract is a question of law." In Estate of Neiswender,

2000 SD 112, ¶ 12, 616 NW2d 83, 86.

> Contract interpretation is a question of law reviewable de
> novo. Because we can review the contract as easily as the
> trial court, there is no presumption in favor of the trial
> court's determination. When the meaning of contractual
> language is plain and unambiguous, construction is not
> necessary. If a contract is found to be ambiguous the
> rules of construction apply. Whether the language of a
> contract is ambiguous is . . . a question of law.

Vander Heide v. Boke Ranch, Inc., 2007 SD 69, ¶ 17, 736 NW2d 824, 831-32 (citing

Ziegler Furniture and Funeral Home, Inc. v. Cicmanec, 2006 SD 6, ¶ 14, 709 NW2d

---

1.     The trial court indicated that the option exercise date of February 23, 2005, should be utilized but also found under the testimony that no change in value occurred between the option exercise date and the first appraisal date; hence the April 27 date.

350, 354). "[W]hen contract language is ambiguous, and does not speak to a subject it would normally be expected to, the court may go beyond the four corners of the contract." *Id.* ¶ 40 (citation omitted).

ANALYSIS AND DECISION

ISSUE ONE

[¶13.] **Whether the First Addendum constituted a valid contract which could be enforced by the parties.**

[¶14.] Akers argue that the contract in question is unenforceable because it fails to set forth, in writing and with sufficient certainty, all material terms. Akers thus contend there was no meeting of the minds to form a valid contract. Akers further argue that even assuming a valid contract existed the trial court erred in its determination as to the appropriate relief to be granted in order to enforce it. We begin with an examination of whether a valid contract was created.

[¶15.] The essential elements of a contract are set forth in SDCL 53-1-2, and three of the elements (parties capable of contracting, a lawful object, and sufficient cause or consideration) are not at issue in this appeal. The final element is consent to contract, which is "a question of law and is to be judged on the objective facts of the particular case." Amdahl v. Lowe, 471 NW2d 770, 774 (SD 1991) (citing *Federal Land Bank v. Houck,* 68 SD 449, 4 NW2d 213 (1942); *McPherson v. Fargo,* 10 SD 611, 74 NW 1057 (1898)). Akers argue that the First Addendum was insufficient because it did not contain the specific date upon which the third appraiser would base his evaluation.

> The statute of frauds requires that contracts for the sale
> of land must not only be in writing and signed by the
> party who is to be charged, but the writing must contain

> all the material terms and conditions of the oral agreement between the parties. To satisfy the statute of frauds, a memorandum for the sale of land must describe the land, the price, and the contracting parties; it need not detail the form or delivery of deed, the time and place of payment, or any other matters. The statute of frauds requires only that the writing evidence the substance of the contract. There is no fatal ambiguity if the contract terms are sufficiently certain to make the acts required of each party clearly ascertainable.

*Amdahl*, 471 NW2d at 774-75 (citations omitted).

[¶16.] "If an agreement leaves open essential terms and calls for the parties to agree to agree and negotiate in the future on essential terms, then a contract is not established." Weitzel v. Sioux Valley Heart Partners, 2006 SD 45, ¶ 23, 714 NW2d 884, 892 (citations omitted). Akers assert that the date for the third appraisal is a material term of the contract and since the First Addendum provided no such date the contract fails. In support of this assertion, Akers note that the third appraiser, Simpson, testified that the date of appraisal was material to him. Read in context, however, Simpson was merely stating a non-legal opinion that the outcome of his appraisal would be affected by the date he used to set that price. The reason it would affect the outcome is that between the dates of LaMore's appraisal and Akers' appraisal many improvements were made by lessee LaMore and an outside offer was also made on the property.

[¶17.] The mere fact that the date of the third appraisal could affect the purchase price does not make it a material element of the contract. Additionally, Akers cite no case authority for the proposition that a contract fails if it leaves the date of appraisal to the discretion of the appraiser, or inferentially, to the rules used by appraisers in conducting follow-up appraisals. Black's Law Dictionary 998 (8th

ed 2004) defines "material" as: "Of such a nature that knowledge of the item would affect a person's decision-making process; significant; essential."  However, Black's Law Dictionary defines "material term" as: "Contractual provisions dealing with significant issues such as subject matter, *price*, payment terms, quantity, quality, duration, or the work to be done."  *Id.* at 1510.  (emphasis added).  Simpson is not legally trained, nor was he called to testify as a legal expert.  Simpson merely testified that the date of appraisal was material to his outcome.  He did not testify that the date of appraisal was a "material term".

[¶18.]     Purchase price, of course, is a material term to a real estate contract. *See Amdahl*, 471 NW2d at 775 (citing Boekelheide v. Snyder, 71 SD 470, 26 NW2d 74 (1947); Carpenter v. Murphy, 40 SD 280, 167 NW 175 (1918); Phelan v. Neary*, 22 SD 265, 117 NW 142 (1908)).  The price term, therefore, must be sufficiently definite for this Court to give it an exact meaning.  *See e.g.*, *Weitzel*, 2006 SD 45, ¶ 23, 714 NW2d at 892 (citations omitted).  "However, absolute certainty is not required; only reasonable certainty is necessary."  *Id.*  We have previously held that not all terms, such as price, need be set out in the contract as long as they are in fact fixed and determinable or reasonably certain.  *See generally*, Nygaard v. Sioux Valley Hosp. & Health Sys., 2007 SD 34, ¶ 15, 731 NW2d 184, 191-92.  In fact, "words that fix an ascertainable fact or event, by which the term of a contract can be determined, make the contract definite and certain in that particular."  *Id.* ¶ 13 (citing Kuhfeld v. Kuhfeld*, 292 NW2d 312, 315 (SD 1980)).

[¶19.]     LaMore asserts that option agreements are sufficiently definite as to price to justify their enforcement if a practicable mode is provided by which the

price can be determined by the court without any new expression by the parties themselves.  We agree.

[¶20.]        "An agreement is not unenforceable for lack of definiteness of price or amount if the parties specify a practicable method by which the amount can be determined by the court without any new expression by the parties themselves."  1 Corbin on Contracts § 98 (1963).  Likewise, option agreements have generally been held or recognized to be sufficiently definite as to price to justify their enforcement if either a specific price is provided for in the agreement or a practicable mode is provided by which the price can be determined by the court without any new expression by the parties themselves.  J.R. Harvey, Annotation, *Requisite definiteness of price to be paid in event of exercise of option for purchase of property*, 2 ALR3d 701, 703 (1965).  Thus, an option to purchase at a price to be fixed by third persons acting as appraisers or arbitrators does not fail for lack of definiteness.  77 AmJur2d *Vendor and Purchaser* § 38 (2007).

[¶21.]        In this case, the method of determining price was the appraisal process, controlled by the terms of the First Addendum entered into by Akers.  Other jurisdictions have upheld similar mechanisms for determining purchase price. *See* Kane v. McDermott, 547 NE2d 708, 713 (IllApp 4th 1989) (holding option to purchase real estate contained in lease which stated that tenant would purchase "at the appraised bid as established by three disinterested persons" by definition meant that the price was to be the fair market value of the property as set by three disinterested persons); Miller v. McCullough, 224 SE2d 916 (1976) (finding option contract which provided that the selling price of the property would be "the

appraised value of the property at the time of purchase based on an MAI Appraisal" to be sufficiently definite); *see generally*, J.R. Harvey, Annotation, *Requisite definiteness of price to be paid in event of exercise of option for purchase of property*, 2 ALR3d 701 (1965).

[¶22.]    In Marder's Nurseries, Inc. v. Hopping, 171 AD2d 63, 66 (NYAppDiv 1991), a contract for the sale of real property was held to be sufficiently definite where it called for the purchase price to be the fair market value as set by two appraisers, and if they could not agree, they would appoint a third appraiser, and the price would be set by the decision of any two appraisers.  In so holding, the court noted the imperfect nature of the method chosen by the parties.

> The method designed by the parties, moreover, is seriously flawed, since there is no guarantee that the first two appraisers would agree, or that, in the event of their disagreement, they would be able to agree as to the identity of the third appraiser.  Further, there is no guarantee that the third appraiser, if he or she agreed to the appointment, would concur with either one of the original two.  We nonetheless conclude that this provision is not so indefinite as to require cancellation of the contract.

*Id*. at 71.

[¶23.]    The method in the present case is similarly flawed.  There is no guarantee that the first appraiser and the third appraiser will agree on the fair market value or on the date which they ought to appraise the property.  However, "a contract should not be canceled solely on the ground that the parties, having stipulated that the purchase price was to be determined by a group of appraisers, failed to foresee all possible obstacles or hindrances which might arise during the course of the appraisal procedure." *Id*. at 71-72.

[¶24.]     In the instant case, the trial court found that "[b]y executing the First Addendum, the parties agreed as to a methodology to determine the values of the Denny's locations as determined by an MAI certified appraiser(s)." Furthermore, the trial court found that "an agreement to leave the calculation to a third party or parties constitutes an acceptable method of evaluation." The price term is sufficiently definite because both parties specifically agreed to pay or accept whatever price could be agreed upon by the appraisers.

[¶25.]     Also, the First Addendum clearly altered the method by which price was to be determined. It altered the way in which the appraisers would work together and eliminated the minimum price term of $2.5 million. Furthermore, the express terms of the Addendum provided that "each of the parties desires [sic] to execute this Addendum, so as to modify certain terms and conditions . . . in the Lease" and "the parties hereto, *intending to be legally bound by the terms hereof* agree to amend the Lease Agreement as follows." "These words are indicative of a completed agreement, and do not establish that there are material details upon which the parties have not yet reached agreement." *Amdahl*, 471 NW2d at 775 (citing 17A AmJur2d *Contracts* § 32 (1991). *Cf.* Wiggins v. Shewmake, 374 NW2d 111, 115 (SD 1985)). We, therefore, hold that the contract is valid.

ISSUE TWO

[¶26.]     **Whether the trial court had the authority to determine a date of valuation when none was supplied.**

[¶27.]     The trial court ordered that the valuation date to be used by the third appraiser, working with the first appraiser, was April 27, 2005 (the date used by the first appraiser). Akers' maintain that the date of appraisal is a material term of the

contract and that by supplying the date of appraisal the trial court erred by way of reforming the contract. In the alternative, they argue that if the trial court *properly* engaged in reformation it abused its discretion by selecting the date the option was exercised as the date for valuation.

[¶28.]     However, as previously stated, we believe the date of appraisal is not a material term of this contract, the price term is sufficiently definite, and a valid contract exists. Therefore, the issue is not whether the trial court erred by engaging in reformation but whether the court had authority to consider parol evidence on the question of which date the third appraiser should use.

*Introduction of Parol Evidence*

[¶29.]     The parties in this case first encountered trouble when they could not agree on who would serve as the third appraiser. The trial court ordered the parties to live up to the First Addendum and find agreement on naming a third appraiser, which they did by selecting Simpson, an appraiser offered by Akers. The parties then returned to the court because Simpson was unsure of what date to use for valuation. The trial court heard extrinsic evidence in the form of live testimony from Simpson, as well as argument from counsel, and ordered Simpson to use the same date as the first appraiser, April 27, 2005.

[¶30.]     It is a long standing principle that "[p]arol or extrinsic evidence may not be admitted to vary the terms of a written instrument or to add to or detract from the writing." Jensen v. Pure Plant Food Int'l. Ltd., 274 NW2d 261, 263-64 (SD 1979) (citation omitted). However, "when the writing is uncertain or ambiguous . . . such evidence is admissible to *explain* the instrument." *Id.* (Emphasis added).

Furthermore, "[i]n construing a contract where ambiguities exist, established trade customs and usages may ordinarily be considered." Mash v. Cutler, 488 NW2d 642, 647 (SD 1992) (citing 17A AmJur2d *Contracts* § 355 (1991)). While this Court has never decided whether parol evidence is admissible to explain a method for determining a price term, we have allowed such evidence regarding other essential terms of a contract for the sale of land. In *Amdahl*, 471 NW2d at 775, we stated that "[a] general description of the land which is the subject of the contract is sufficient, and parol evidence may be admitted to provide the more particular description." *Id.* (citing Habeck v. Sampson, 88 SD 437, 221 NW2d 483 (1974); 2 Corbin on Contracts § 499). "This is an established exception to the general rule that testimony is inadmissible for the purpose of proving the terms of a contract for the sale of an interest in land which the statute of frauds requires to be in writing." *Id.* Finally, Restatement of Contracts (Second) § 362(b) (1981) provides:

> Apparent difficulties of enforcement due to uncertainty
> may disappear in the light of courageous common sense.
> Expressions that at first appear incomplete may not
> appear so after resort to usage. . .

However, before extrinsic evidence can be heard the contract must be deemed uncertain or ambiguous. In re J.D.M.C., 2007 SD 97, ¶ 30, 739 NW2d 796, 806.

*Ambiguity in the First Addendum*

[¶31.]     The trial court did not make a conclusion of law as to whether ambiguity exists in this agreement. However, whether the language of a contract is ambiguous is a question of law for the court, which is reviewable de novo. All Star Constr.v. Koehn, 2007 SD 111, ¶ 33, 741 NW2d 736, 744 (citation omitted). "[A] contract is ambiguous only when it is capable of more than one meaning when

viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." Ducheneaux v. Miller, 488 NW2d 902, 909 (SD 1992) (citations omitted). The First Addendum provides:

> In the event that the second MAI certified appraiser determines that an appraised value exceeds the initial MAI certified by more than seven percent, the parties shall agree on a third MAI appraiser *who shall work with the initial MAI certified appraiser to determine the appraised value.*

(Emphasis added).

[¶32.] Within the context of the entire agreement, it is clear that both parties intended to commit the calculation of price to third parties and agreed to be bound by the result. It is also clear that the parties agreed that should the first two appraisals differ by more than seven percent, a mutually agreed upon third appraiser would work with the first appraiser to make the ultimate determination as to the purchase price. As to the material terms of the contract there is no ambiguity. However, as to the nonessential terms there exists ambiguity.

[¶33.] The phrase "the parties shall agree on a third MAI certified appraiser who shall work with the initial MAI certified appraiser to determine the value," is imprecise as to what date the third appraiser should use to set value. Therefore, the trial court properly considered custom and usage testimony from Simpson, who has been an appraiser in the Rapid City area for thirty-two years. Simpson testified that per industry guidelines when multiple appraisers appraise a piece of property they use the same date of valuation:

> Q. (By Mr. Nooney) Typically, in your experience, Mr. Simpson, and consistent with the guidelines that you operate under, be it the American Institute of Appraisers or some other designation, when multiple appraisers appraise a piece of property, do they typically use different dates?
>
> A. No. Not under this type of circumstance.

Furthermore, Simpson testified that in all of his experiences conducting second appraisals he has never used a different date of valuation than the first appraiser. As the trial court noted, using different dates for the appraisal would be comparing apples to oranges.

[¶34.] After LaMore exercised the option, but before Haeder conducted the second appraisal, LaMore paid for almost $200,000 worth of improvements to the properties and Akers received an outside offer on the properties. Both of these factors significantly affected the market value as reflected in Haeder's appraisal. In fact, it resulted in the two appraisals differing by over $540,000. Indeed, the property to be sold was not the same property on December 1, 2005, as it was when LaMore exercised the option to purchase.[2] The apple became an orange.

[¶35.] Also, the plain language of the First Addendum expressly states that the third appraiser was to "work with the *initial* . . . appraiser to determine the appraised value." (Emphasis added). There is simply no mention of the initial appraiser and the third appraiser even considering the second appraisal. In fact, under the language of the First Addendum, if the second appraisal differed by more

---

2. Since we have determined that the agreement satisfied the statute of frauds we need not consider whether the agreement should be specifically enforced under SDCL 53-8-2(3) and the Restatement of Contracts (Second) § 129 due to LaMore's change in position and reliance upon the agreement.

than seven percent from the first, the second appraisal was dropped entirely. Thus, Akers' argument that Simpson should have been instructed to use December 1, 2005, the date of the second appraisal, fails.

[¶36.]    We find there was a sufficient basis for the trial court to interpret the contract as requiring the first and third appraisers to use April 27, 2005, effectively the date the option was exercised, as their date of valuation.   Accordingly, we affirm.

[¶37.]    BARNETT, Circuit Judge, for SABERS, Justice, disqualified.

[¶38.]    GILBERTSON, Chief Justice, KONENKAMP, ZINTER and MEIERHENRY, Justices, concur.