#28799-r-MES
**2019 S.D. 52**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

TROY DYSART and
RICHARD HEINRICH,                     Plaintiffs and Appellees,

    v.

DRAGPIPE SALOON, LLC,                 Defendant,

    and

PATRICK KERWIN and
RAYMOND MEYERS,                       Defendants and Appellants.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
LAWRENCE COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE MICHELLE K. COMER
Judge

\* \* \* \*

MICHAEL W. STRAIN of
Strain Morman Law Firm
Sturgis, South Dakota                 Attorneys for plaintiffs and
                                    appellees.

DYLAN A. WILDE
Spearfish, South Dakota               Attorney for defendants and
                                    appellants.

\* \* \* \*

CONSIDERED ON BRIEFS
ON MAY 28, 2019
OPINION FILED **09/04/19**

#28799

SALTER, Justice

[¶1.] Two members of a limited liability company known as Dragpipe Saloon, LLC (Dragpipe) requested judicial dissolution ancillary to their efforts to sell their membership interests. Following a court trial, the circuit court ordered dissolution and the sale of Dragpipe's assets. The remaining members appeal, arguing the circuit court erred when it concluded that it was not reasonably practicable for Dragpipe to continue under the provisions of its operating agreement and that Dragpipe's economic purpose was unreasonably frustrated. We reverse.

## Background

[¶2.] Raymond Meyers, Penney Weast, Troy Dysart, and Richard Heinrich formed Dragpipe in 2003. Each member contributed $10,000 and received a 25% membership interest and voting rights. Dragpipe's operating agreement states that its purpose

> is to engage in all lawful activities, including, but not limited to, owning, purchasing, taking, leasing, or otherwise holding or acquiring real property and any interest or right in real property and any improvements thereon, and to hold, own, operate, control, maintain, manage and develop such property and interests in any manner that may be necessary, useful or advantageous . . . [to the] company.

[¶3.] The operating agreement also provides that Dragpipe may be dissolved and its affairs wound up with the unanimous vote of the members or by a decree of judicial dissolution pursuant to South Dakota's enactment of the Uniform Limited Liability Company Act. *See* SDCL ch. 47-34A. Individual members may also voluntarily resign their membership under the provisions of the operating agreement and obtain the "fair market value of [the member's] Ownership Interest,

-1-

adjusted for profits and losses to the date of resignation." In the event of a resignation, the fair market value would be determined by a unanimous vote of the members or, failing that, by an independent appraiser.

[¶4.]     The members purchased 74 acres of land off Highway 79 northeast of Sturgis for approximately $135,000 and built a bar that is open only during the Sturgis Motorcycle Rally (Rally), which runs for approximately ten days every year in August. Of the 74 acres purchased, 18 acres were used to operate the bar, and the remaining land was leased to a farmer. Dragpipe obtained a malt beverage license and opened for business during the 2004 Rally, selling beer, soft drinks, water, and t-shirts. The company also hosted food vendors and provided live entertainment.

[¶5.]     In January 2005, Penney Weast sold her membership interest to Patrick Kerwin. Dragpipe later expanded by opening a campground on the property in 2009. Camping was free until 2013, when the company began to charge camping fees in an effort to improve revenue. Dragpipe had its first profitable year in 2015 and posted modest profits in 2016 and 2017.

[¶6.]     Each member has invested approximately $80,000 in the company. The members also provide labor during the Rally without compensation—typically working over 12 hours each day. The members have not received income distributions. However, Dragpipe's net income from 2015 to 2017 did allow it to pay the mortgage expense previously contributed pro rata by the members. The profits also allowed Dragpipe to reimburse the members for their out-of-pocket expenses.

[¶7.]        Following the 2015 Rally, Dysart and Heinrich (Appellees) advised Kerwin and Meyers (Appellants) that they wanted to sell their membership interests in Dragpipe. The Appellants expressed no objection, and the Appellees initially appeared to have found buyers for their combined one-half interest. However, one of the prospective buyers rescinded his offer, leaving the remaining purchaser to purchase one-quarter interest. The Appellees elected not to proceed with the sale based upon their inclination to sell their interests together.

[¶8.]        In early 2017, the Appellees and Kerwin signed a six-month agency agreement with a real estate agent intending to offer to sell the Dragpipe property for $950,000. Meyers, however, would not sign the agreement. Despite the apparent effort to end their membership, the Appellees did not invoke their right under the operating agreement to voluntarily resign their interests. Nor did the members vote to dissolve Dragpipe under the authority provided in the operating agreement.

[¶9.]        Instead, the Appellees commenced this action in June 2017, seeking judicial dissolution and an order authorizing the sale of Dragpipe's assets. Following a court trial, the circuit court granted the Appellees' request for dissolution. In its written findings of facts and conclusions of law, the circuit court found that "the profit made in [2015-2017] is insufficient to begin repaying the capital contributions made by the members." The court further found that the parties were "at a standstill" on whether to sell the property and determined that the only way for Dragpipe to make money was to sell its real estate. The court concluded that judicial dissolution was authorized under SDCL 47-34A-801(a)(4)(i)

and (iii) because Dragpipe's economic purpose was unreasonably frustrated and because it was not reasonably practicable to carry on its business in conformity with the operating agreement.

[¶10.]     The Appellants challenge the circuit court's decision to order dissolution and present one issue for our review, restated as follows: Whether the circuit court erred in its interpretation of Dragpipe's operating agreement and its determination to order judicial dissolution pursuant to SDCL 47-34A-801.

### Analysis

[¶11.]     The circuit court's decision rests upon its interpretation of the operating agreement and the application of our statutes governing judicial dissolutions.  Both implicate legal questions that are reviewed de novo.[1]  *See Domson, Inc. v. Kadrmas Lee & Jackson, Inc.,* 2018 S.D. 67, ¶ 28, 918 N.W.2d 396, 405 (holding that contract interpretation is a question of law reviewed de novo); *see also McDonough v. McDonough,* 153 A.3d 187, 190 (N.H. 2016) ("[T]he general rules of contract interpretation" apply to operating agreements since they are a "form of contract[.]" (citation omitted)); *Mergen v. N. States Power Co.,* 2001 S.D. 14, ¶ 4, 621 N.W.2d 620, 622 ("The construction of a statute and its application to the facts present questions of law, which we review de novo." (quoting *State v. Springer-Ertl,* 1997 S.D. 128, ¶ 4, 570 N.W.2d 39, 40)).

[¶12.]     A limited liability company, or LLC, is a distinct legal entity that offers, among other things, limited liability for its members from contract and tort

---

1.     Given our determination of these legal issues, we perceive no need to review the circuit court's factual findings, which we accept as correct for our analysis.

claims. *See Smith v. Rustic Home Builders, LLC*, 2013 S.D. 9, ¶¶ 7-8, 826 N.W.2d 357, 359-60 (explaining that an LLC's distinct legal identity means it cannot be represented pro se by its non-lawyer manager). Among organized business associations, an LLC is considered a "hybrid entity which combines the benefits of corporations and partnerships . . . includ[ing] limited liability, taxation as a partnership, and a flexible management style." Patrick G. Goetzinger, Brian K. Kirby & Terrance A. Nemec, *The South Dakota Limited Liability Company Act: The Next Generation Begins,* 44 S.D. L. Rev. 207, 209 (1998).

[¶13.] Members of a limited liability company may choose to enter into an operating agreement "to regulate the affairs of the company and the conduct of its business, and to govern relations among the members, managers, and company." SDCL 47-34A-103. An LLC's operating agreement may specify the circumstances under which a limited liability company will be dissolved and its business wound up. SDCL 47-34A-801(a)(1)-(2). Beyond this authority provided by agreement, the Legislature has given courts "limited power to order dissolution of an LLC if certain statutory standards are met." *Kirksey v. Grohmann*, 2008 S.D. 76, ¶ 13, 754 N.W.2d 825, 827; *see also* SDCL 47-34A-801(a)(4).

[¶14.] An LLC may be dissolved by judicial decree, as relevant here, "on application by a member or a dissociated member" if

> (i) The economic purpose of the company is likely to be unreasonably frustrated; [or]
> *****
>
> (iii) It is not otherwise reasonably practicable to carry on the company's business in conformity with the articles of organization and the operating agreement . . . .

SDCL 47-34A-801(a)(4).

[¶15.] An involuntary judicial dissolution represents an exceptional level of intervention into the otherwise private agreement of an LLC's members. *See In re Involuntary Dissolution of Wiles Bros., Inc.*, 830 N.W.2d 474, 480 (Neb. 2013) ("[T]he statutory remedy of dissolution and liquidation is so drastic that it must be invoked with extreme caution."). It should be unavailable merely to resolve disagreements among owners or relieve an owner of an investment decision later regarded as improvident. Rather, judicial dissolution is permitted only in those instances where it is expressly authorized under our statutes.

[¶16.] For example, in *Kirksey*, we held that judicial dissolution was authorized where the economic purposes of the LLC were likely to be unreasonably frustrated and because continuing the LLC's business was no longer practicable. 2008 S.D. 76, ¶ 29, 754 N.W.2d at 831; *see also* SDCL 47-34A-801(a)(4)(i), (iii). The members in *Kirksey* were four sisters who had formed the LLC and contributed their equal interests in ranch land inherited from their mother. 2008 S.D. 76, ¶¶ 2-3, 754 N.W.2d at 826. Two sisters were also tenants who leased the ranch land under terms that became increasingly favorable to them as the value of the land appreciated dramatically. *Id.* ¶¶ 5, 8, 754 N.W.2d at 826-27. They resisted efforts by the other two sisters to terminate the lease and sell the land, resulting in an "impenetrable deadlock" because there was no method of resolving the dispute under the articles of organization or the operating agreement. *Id.* ¶¶ 8, 9, 29, 754 N.W.2d at 827, 831. We recognized that "forced dissolution is a drastic remedy," but we concluded that the tenant-sister faction wielded disproportionate power over the

other two sisters and that judicial dissolution was statutorily authorized. *Id.* ¶ 29, 754 N.W.2d at 831.

[¶17.] In this case, we believe the circuit court incorrectly concluded that compulsory judicial dissolution was permitted under SDCL 47-34A-801(a)(4)(i) and (iii). As to the latter basis, we believe the circuit court's findings fail to support the legal conclusion that it is no longer practicable for Dragpipe to continue to operate in accordance with its operating agreement. The operating agreement broadly states Dragpipe's purpose as "owning, purchasing, taking, leasing, or otherwise holding or acquiring real property" and to "hold, own, operate, control, maintain, manage and develop such property and interests in any manner that may be necessary, useful or advantageous[.]" Here, Dragpipe did, in fact, "purchas[e] . . . real property" that it now "hold[s], own[s], operate[s], maintain[s] [and] manages[s.]" Continuing to do so is no less practicable now than it has been throughout Dragpipe's history of operation.

[¶18.] The fact that the Appellees believe it to be a prudent time to sell Dragpipe's real property and realize the gain from their investments does not mean Dragpipe is unable to continue to operate in accordance with its stated purposes. Nor do the historic losses or Dragpipe's failure to return income distributions to its members render its operation impracticable. In more recent years, Dragpipe's performance has improved and yielded profitable results, if not large cash returns, for its members. It may well be that the Appellees have grown weary of Dragpipe's lukewarm revenue outcomes over the years, but that does not, itself, mean that

Dragpipe is not "carry[ing] on the company's business in conformity with . . . the operating agreement[.]" *See* SDCL 47-34A-801(a)(4)(iii).

[¶19.]     A similar analysis applies to the circuit court's separate determination that "the economic purpose of the LLC is likely to be unreasonably frustrated." *See* SDCL 47-34A-801(a)(4)(i). Relying again upon the circuit court's findings contained in this record, we believe the court erred in its legal conclusion. In the absence of an order directing judicial dissolution, Dragpipe will continue to operate more or less as it has since its inception. Even if, as the circuit court found, the principal means of making money for Dragpipe's members will ultimately be through the sale of the real property, that does not mean that the members' failure to reach a consensus about a proposed sale here is likely to frustrate Dragpipe's economic purpose.

[¶20.]     Under the plain and unambiguous terms of the operating agreement, the Appellees can resign and receive the fair market value of their interests. In the event the members do not agree upon the fair market value, the operating agreement states that the value will be determined by an independent appraiser. Yet, the Appellees have not availed themselves of this option.[2] Nor does it appear they have continued in their efforts to sell their interests outright. The other two

---

2.    The circuit court's finding that Dragpipe is unable to fund the purchase of the Appellees' individual interests from cash is supported by the record, but that bare fact, itself, does not suggest unreasonable frustration. This is particularly true given Dragpipe's previous ability to access credit and the members' history of contributing capital. In this regard, the operating agreement also provides that the remaining voting members may, themselves, purchase the resigning member's individual interests.

members do not object to such a sale and, in fact, the prior sale of Weast's interest to Kerwin was successful without the need for judicial intervention or dissolution.[3]

[¶21.]     Beyond this, there is no "impenetrable deadlock" and no indication that a member or member-faction is benefitting from the disagreement regarding the proposed sale of Dragpipe's real estate to the prejudice of the other members.[4] *See Kirksey*, 2008 S.D. 76, ¶ 29, 754 N.W.2d at 831.  The circuit court's determination that the members were "at a standstill" is attached to the implicit legal conclusion that Dragpipe *must* sell its real estate now.  However, we do not perceive the same degree of urgency when we interpret the text of Dragpipe's operating agreement and consider the legal standards for judicial dissolution.

[¶22.]     Therefore, we hold that the circuit court erred in its interpretation of the operating agreement and in its application of SDCL 47-34A-801(a)(4)(i) and (iii). The economic purpose is not likely to be unreasonably frustrated by Dragpipe's continued operation, and it is operating within the purposes stated in the operating agreement.  The members are not effectively deadlocked and have multiple options for resolving their disagreement about the sale of Dragpipe's real estate.  Under the circumstances, we conclude that the "drastic remedy" of judicial dissolution is not supported and that the circuit court's judgment of dissolution must be reversed.

---

3.     The operating agreement also provides the options of mediation and binding arbitration, but the record does not indicate the members pursued either.

4.     Indeed, even after the commencement of this action for judicial dissolution in July 2017, the parties worked together at the Rally without any apparent difficulty.

#28799

[¶23.]      GILBERTSON, Chief Justice, and KERN and JENSEN, Justices, and MEIERHENRY, Retired Justice, concur.

[¶24.]      DEVANEY, Justice, not having been a member of the Court at the time this action was assigned to the Court, did not participate.